683 F.2d 963
 Doris BELL, Maynard Bell, Ann H. Benoit, Cecil R. Benoit,
Paulette McGregor, and Jacques McGregor,
Plaintiffs-Appellants,
v.
BOARD OF EDUCATION, AKRON PUBLIC SCHOOLS; Conrad C. Ott,
Superintendent, Akron Public Schools; City of Akron; Mayor
John S. Ballard; Akron Metropolitan Housing Authority; David
Levey, Director, Akron Metropolitan Housing Authority; and
Paul J. Everson, President, Ohio Real Estate Commission,
Defendants-Appellees.
 Nos. 80-3390, 80-3507.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 6, 1981.
Decided July 8, 1982.
 
 Robert Allen Sedler, Detroit, Mich., Daniel T. Wilson, Anna Maria Barnum, Randall L. Johnson, Akron, Ohio, for plaintiffs-appellants.
 John M. Glenn, Buckingham, Doolittle & Burroughs, Edward Riegler, Eugene Oestreicher, Akron, Ohio, B. Douglas Anderson, Asst. Atty. Gen. of Ohio, Columbus, Ohio, for defendants-appellees.
 Before EDWARDS, Chief Judge, and MERRITT and BROWN, Circuit Judges.
 MERRITT, Circuit Judge.
 
 
 1
 In this school desegregation case from Akron, Ohio, plaintiffs-appellants sought to prove in the court below, and they argue on appeal, three basic liability claims against the school board:
 
 
 2
 1. Pre-1965 School Board Conduct.-"(A)s a direct result of intentionally segregative acts and omissions by 1965, the Akron school board was maintaining an enclave of racially identifiable black schools in the middle-western portion of Akron." Brief for plaintiffs-appellants, Docket No. 80-3507, p. 17. Plaintiffs describe the "segregative acts" in question as follows: "In the period from 1954-1965, the Akron school board made a number of attendance zone changes and established a number of optional zones that removed white students in substantial numbers from South High School, West and Thornton Junior High Schools, and Crouse and Schumacher Elementary Schools." Id. at 18. "Optional zones" in Akron permit students living within the zone to choose between two schools in the area.
 
 
 3
 2. Post-1965 School Board Conduct.-"Because a dual school system for constitutional purposes was established by the intentionally segregative acts and omissions of the Akron school board no later than 1965, the Akron school board was under a continuing and affirmative duty both to dismantle the dual school system, and until that duty was satisfied, to prevent other school in the system from becoming racially identifiable. For this reason, proof of segregative intent is not necessary with respect to the post-1965 actions of the board .... Far from satisfying its constitutional duty to dismantle the school system, in the period after 1965, the Akron school board engaged in intentional acts and omissions that perpetuated and increased the racially segregative character of the school system." Id. at 47-48. The plaintiffs argue that "the measure of the post-1965 conduct of the Akron school board must be segregative effect rather than segregative intent." Id. at 48.
 
 
 4
 3. School Board Responsibility to Dismantle Segregative Effect of Housing Discrimination By Other Governmental Agencies.-"In this case, the Akron school authorities contended ... that the condition of school segregation in the system and the existence of a large number of racially identifiable schools was not due to intentional racially discriminatory and segregative actions on their part but instead was due to patterns of residential racial segregation, which, interacting with geographic attendance zoning as the primary method of school assignment, produced racially segregated schools. Count II of the complaint proceeds on the assumption (which is disputed in Count I of the complaint) that the school authorities are correct in this contention. The theory of Count II of the complaint is that if the intentional racially discriminatory actions of governmental agencies at all levels (federal, state and local) contributed to those patterns of residential racial segregation, the resulting school segregation is de jure and subject to redress." Appellant's Brief, Docket No. 80-3390, p. 5.
 
 
 5
 In 1968 different plaintiffs in a class action sponsored by the National Association for the Advancement of Colored People litigated and lost issues similar to those described in the first paragraph above. Arnold v. Ott, No. G65-707 (N.D.Ohio, October 16, 1968). The 1968 plaintiffs dismissed their appeal in this Court, No. 19258 (6th Cir. March 10, 1969). The District Court in 1968 decided the case against plaintiffs and the class consisting of black students in the Akron schools. The District Court found that the defendant school board had not fixed school zone boundaries or made zone changes or created optional zones with segregative intent. On the issue respecting optional zones allegedly created with a segregative intent-the same basic claim as in the instant case-the 1968 decision concluded that plaintiffs had failed to prove the following claims:
 
 
 6
 "In answer to interrogatories seeking to elicit specific answers of board discriminatory policy, plaintiffs responded: "The Board of Education employs optional zones which give pupils residing in a certain area the choice of attending one of two schools. When these optional zones are analyzed, it appears that those students residing in white residential areas have the option of attending either a racially imbalanced school or a white school.'
 
 
 7
 "Plaintiffs' exhibit GG-2 details what purports to be over a dozen such optional zones. The 'options' presented are numerous. For example, all white optional zones have the choice of attending either of two all-white school (Windemere-Ritzman); predominantly Negro optional zones have the choice of attending predominantly Negro or predominantly white schools (Miller-Leggett)."
 
 
 8
 Uncertain of the precise effect to be given the 1968 decision, the District Court in the instant case again heard the case on the merits and decided that the defendant board had not drawn school zone boundaries or created optional zones with segregative intent. On Count II, the housing count, the court declined to rule on the alleged discriminatory housing practices of the federal and state governments because they were not parties and ruled on the merits that the other governmental agencies were not guilty of conduct undertaken with segregative intent.
 
 I. THE EFFECT OF THE 1968 AKRON DECISION
 
 9
 The initial question presented on appeal concerns the effect of the 1968 decision. We conclude that the issues presented on appeal in the instant case respecting the actions of the board prior to 1965 are so similar to the issues adjudicated in the 1968 action as to preclude reconsideration here. Although the 1968 court did not formally certify the plaintiff class by separate order prior to its decision on the merits, the record reveals no objection to the class, and the court in the first and second paragraphs of its 1968 opinion refers with approval to the action as one on behalf of "Negro students as a class."
 
 
 10
 Our decision on the effect of the 1968 Akron decision is governed by Bronson v. Board of Education, 525 F.2d 344 (6th Cir. 1975), a similar school desegregation class action case. The Court weighed traditional common law and due process principles favoring the finality of judgments in cases previously decided against principles favoring the vindication of constitutional rights and the correction of errors of constitutional magnitude. The Court, in an opinion by Judge Lively, concurred in by Chief Judge Phillips, held that a 1965 decision in the Cincinnati school desegregation case precluded the reconsideration of the specific issues considered and decided earlier. The decision was based on a finding that the class was adequately represented in the prior case and that there has been no significant change in the law. The Court concluded that "a public body should not be required to defend repeatedly against the same charge of improper conduct if it has been vindicated in an action brought by a person or group who validly and fairly represent those whose rights are alleged to have been infringed." Id. at 349. The Court said that "these issues have been decided and under the issue preclusion application of collateral estoppel may not be reopened." Ibid.
 
 
 11
 Judge Lively's opinion considers two factors in addition to the similarity of issues in the two cases. The first is the adequacy of representation of the class members in the earlier action and the relationship between the named plaintiffs and class members in the earlier action and in the later action. "Though the plaintiffs in the instant action are not the same persons as those who instituted" the earlier case, the Court observed, "that action was brought to vindicate the rights of all minority school children and parents affected by the actions and policies of the Cincinnati board." The Court found that "there is a strong community interest between" the two sets of plaintiffs and class members because "both actions sought relief on behalf of the same group of black citizens." 525 F.2d at 349.
 
 
 12
 The second factor considered in Judge Lively's opinion was whether "intervening decisions ... have changed the law sufficiently to render collateral estoppel inapplicable to the present case." Id. at 347-48. After reviewing developments in the law, the Court concluded that principles of liability in de facto school desegregation cases had not changed significantly from 1965 when the first case was decided to 1975 when Judge Lively's opinion was written.
 
 
 13
 We note that were we to apply a contrary principle rejecting collateral estoppel in school desegregation cases, we would open up for relitigation all school desegregation judgments in de facto school cases. A plaintiff who disagrees with a prior final determination of liability-for example in Columbus or Dayton-would be entitled to relitigate the finding of liability. Rights and duties in desegregation cases previously litigated and established would never become final. They would always be subject to collateral attack. Desegregation judgments, like tickets to the theater, would be good for today's show only.
 
 
 14
 Our decision in the instant case that the 1968 Akron decision precludes relitigation of renewed allegations concerning pre-1968 boundary line changes and optional zones follows the guidelines established in our Bronson decision. It is based on the following factors: (1) There is no showing that the named plaintiffs and the NAACP in 1968 failed adequately to represent the class of black students or that the interests of the named plaintiffs and the class in the instant case are different from those of the 1968 plaintiffs. (2) There has been no significant change in the showing required to establish liability in de facto school desegregation cases since 1968. (3) The basic claims in the two cases regarding the zone lines are the same.
 
 
 15
 We can find in this record no claim or facts supporting a claim that the NAACP lawyers failed to represent fully and zealously the interests of the class in the 1968 action. The interests of the 1968 class and the instant class are the same, and there is no indication that the prior determination was affected by relationships among the parties or the class that are not present in the instant case.
 
 
 16
 We agree with the Bronson court "that there has been no such change in the law" since 1965 as to make the application of traditional doctrines of collateral estoppel unfair. Class actions for injunctive relief fix rights in the aggregate, not individually, and the current definition of the rights of the plaintiffs is basically the same as in 1968.[1]
 
 
 17
 Comparing the liability issues adjudicated in 1968 with those presented here, it appears that statistical evidence describing attendance zones and racial characteristics of the Akron schools in 1968 is basically the same as the evidence presented here. The 1968 challenge was to school zone lines in the same, "midwestern" section of Akron as the present challenge. There is no showing that the schools in this area, claimed to be unconstitutionally segregated in the 1968 action, are different from the schools at issue here. The pattern of optional zones challenged in 1968 appears to be the same as that challenged now. There is no showing that the zones under attack in 1968 were different from those now under attack. The statistics and the racial characteristics used and the schools and the zones in question appear to be the same. The basic theory that optional zones allowed some students to choose between a majority black and majority white school is the same.
 
 
 18
 In one instance (Schumacher Elementary) zone changes allowed a previously majority white school to become 87% black and in another (Crouse) 74% black prior to 1968. In these two instances the 1968 court specifically addressed the zones and found no segregative intent.
 
 
 19
 Although the 1968 court did not specifically mention the other schools plaintiff here claim were also segregated, namely South, Thornton and West, which became respectively 72%, 62% and 68% black before 1968, it would appear that the attendance zones of these schools as well as the statistical information were also before the 1968 court. There is no showing that the 1968 plaintiffs did not have a full and fair opportunity to attempt to prove and argue the plaintiffs present claim that school zone changes before 1965 were unconstitutional at South, Thornton and West because the board had reduced the percentage of whites in those schools to approximately 28% at South, 38% at Thornton and 32% at West.[2]
 
 II. POST-1965 SCHOOL BOARD CONDUCT
 
 20
 The plaintiffs' second argument concerning post-1965 conduct must fail as a matter of law because they do not contend that the Akron school board engaged in any subsequent acts with segregative intent. Their claim is rather that the board failed in its "affirmative duty to dismantle the dual school system" intentionally established before 1965. They assert that under this theory "proof of segregative intent is not necessary," only proof of "segregative effect." Brief, p. 47-48. They do not offer proof of segregative intent for the period following 1965. Their argument is that the board permitted "prior enrollment imbalance" to continue through the continued use of zone patterns, including optional zones, in place in 1965.
 
 
 21
 Since it is our view that the 1968 Akron case precludes reconsideration of plaintiffs' claims that pre-1965 zoning in West Akron intentionally produced a segregated system by 1965, plaintiffs leave the record without any proof of board conduct based on segregative intent. It is now elementary that proof of such intent is constitutionally required in de facto school segregation cases. See Columbus Bd. of Educ. v. Penick, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979).
 
 
 22
 III. SCHOOL BOARD RESPONSIBILITY TO DISMANTLE SEGREGATIVE
 
 EFFECT OF HOUSING DISCRIMINATION BY OTHER
 GOVERNMENTAL AGENCIES
 
 23
 Unlike the issues respecting optional zones and boundary changes specifically addressed by the 1968 Akron decision, that decision did not address plaintiffs' present theory that the intentionally segregative actions of other governmental agencies caused patterns of residential segregation for which the school board is liable. Plaintiffs contend for the first time that "the obligation to remedy this constitutional violation does not fall on the parties who committed it, but on the school authorities" because they "are the only parties that can remedy ... the existence of school segregation (caused by housing segregation) ... and the only parties against which coercive relief can be granted" concerning the assignment of students living in racially isolated residential neighborhoods. Appellant's Brief, Docket No. 80-3390, pp. 6-7.
 
 
 24
 We do not find any case addressing the argument that a school board otherwise innocent of segregative intent is liable for the discriminatory housing practices of other governmental agencies.[3] We decline to accept this argument. Under this argument the discriminatory conduct of the FHA in making housing loans and local housing authorities in the construction and rental of public housing is attributable to school boards. Such a proposal places too heavy a burden on the schools to remedy wrongs for which they are no more or less responsible than the plaintiffs, the courts, the churches, the Congress or other institutions. Plaintiffs do not suggest how the schools, after a finding of liability, would go about remedying this problem or what kind of order a federal court could enter that might as a practical matter have a chance of changing the fact that black and white families live in separate neighborhoods in most towns and cities. Justice Powell's language in the following paragraph concurring in the grant of certiorari in Austin Independent School District v. United States, 429 U.S. 990, 994, 97 S.Ct. 517, 519, 50 L.Ed.2d 603 (1976) seems to state the correct principle concerning the imputation of housing discrimination to the schools:
 
 
 25
 The principal cause of racial and ethnic imbalance in urban public schools across the country-North and South-is the imbalance in residential patterns. Such residential patterns are typically beyond the control of school authorities. For example, discrimination in housing-whether public or private-cannot be attributed to school authorities. Economic pressures and voluntary preferences are the primary determinants of residential patterns.
 
 
 26
 Accordingly, the judgment of the District Court, 491 F.Supp. 916, is affirmed.
 
 
 27
 GEORGE CLIFTON EDWARDS, Jr., Chief Judge, concurring.
 
 
 28
 The District Judge who heard this school segregation complaint found that the Board of Education, Akron Public Schools, had formulated and put into effect a school decommissioning plan which amounted to intentional segregation in a portion of the city schools. He thereupon ordered the school defendants to submit a plan to eliminate the effects of these unconstitutional decisions. He also found that neither these decisions nor any others complained of had resulted in an otherwise intentionally segregated school system.
 
 
 29
 The Board of Education promptly submitted a plan to eliminate the effects of the unconstitutional school decommissioning, which plan was approved by plaintiffs and accepted by the District Judge.
 
 The District Judge also held as follows:
 
 30
 The Board of Education and Superintendent Ott have not denied equal educational opportunities to plaintiffs or the class they represent in violation of their right to equal protection of the laws as guaranteed by the fourteenth amendment.
 
 
 31
 The rights of the plaintiffs and the class they represent to equal protection of the laws guaranteed by the fourteenth amendment were not violated by Paul J. Everson, the city of Akron, the Mayor, the Akron Metropolitan Housing Authority, or its director.
 
 
 32
 The credible evidence has failed to establish the other allegations, contained in the plaintiffs' complaint and the updates of the plaintiffs' allegations, as to any of the defendants.
 
 
 33
 This case is basically one where Plaintiffs failed in their proofs.
 
 
 34
 This court is unanimous in holding on review of this record that none of the District Judge's findings referred to above can appropriately be termed clearly erroneous.
 
 
 35
 Under these circumstances I would not reach the murky problems of issue preclusion posed by this record.
 
 
 36
 BAILEY BROWN, Circuit Judge, concurring.
 
 
 37
 I concur in the opinion authored by Judge Merritt but add a few words of my own.
 
 
 38
 As pointed out in that opinion, appellants have made it absolutely clear that, to the extent that they base their case on conduct of the Board of Education of Akron, they contend that the Board was guilty of unconstitutional discrimination before Arnold v. Ott (the prior Akron school case) and that the Board had the affirmative duty after Arnold v. Ott to undo the effects of such conduct, which it had not done. In this connection, after making this position clear in their brief, appellants' reply brief again states:
 
 
 39
 It is on the basis of the evidence presented in this case-which was not presented in Arnold v. Ott -that it must be determined whether a dual school system for constitutional purposes existed in the Akron Public Schools as of 1965. If such a dual school system existed, the board has the affirmative obligation to dismantle that dual school system, and the existence of that obligation in 1980 cannot be precluded by a finding in the board's favor in a different action in 1968.
 
 
 40
 Appellants contend that the issue preclusion principles of Bronson v. Board of Education, 525 F.2d 344 (6th Cir. 1975) cannot be applied in the instant case because there was no order of certification as a class action in Arnold v. Ott. There are at least two answers to this contention. In the first place, as pointed out in Bronson (525 F.2d at 349), Deal (the prior Cincinnati school case to which Bronson was directed) was not filed as a true class action but instead was a "spurious" class action under Rule 23 before the 1966 amendments. It was for this reason that the Bronson court gave only collateral estoppel or issue preclusion effect to Deal rather than res judicata effect. 525 F.2d at 349. Thus Bronson supports the proposition that issue preclusion would apply here if Arnold v. Ott were not a true class action. The fact is, however, that Arnold v. Ott was filed as a class action to which the 1966 amendments applied, was treated as such by the parties, and while an order of certification was not entered, the district court's opinion twice refers to it as a class action. Accordingly, for our purposes it was a true class action. Senter v. General Motors Corp., 532 F.2d 511, 522 (6th Cir. 1976). It follows, then, that issue preclusion is the minimum effect that can be given to Arnold v. Ott.
 
 
 41
 I agree with Judge Merritt's interpretation of the holding in Bronson, considering the opinions by Judge Lively, Judge Phillips, and Judge Weick (including the opinion on the petition to rehear). In a nutshell, this holding is, as applied to the instant case, that while evidence of facts prior to Arnold v. Ott could be considered as background material to the contention that the Board was guilty of intentional discrimination after that opinion, appellants were precluded from contending that the Board was guilty of intentional discrimination prior to that decision. The sound policy reasons for applying issue preclusion in this case are well set out in Judge Lively's opinion in Bronson (525 F.2d at 349) and Judge Merritt's opinion in this case.
 
 
 42
 I also agree with Judge Merritt's opinion to the effect that intentionally segregative housing actions by other governmental entities, even if proved, cannot be the basis of ordering the Board of Education of Akron to attempt to remedy the results thereof in the schools. In addition to the statement of Justice Powell upon the grant of certiorari in Austin Independent School District v. United States, 429 U.S. 990, 97 S.Ct. 517, 50 L.Ed.2d 603 (1976), quoted by Judge Merritt, this court in Bronson, 525 F.2d at 345-346, referring to Deal I, 369 F.2d 55 (1966), said:
 
 
 43
 This court declared that the critical fact determination in an action charging a school board with violation of the rights of minority pupils is whether an existing racial imbalance is intentionally caused by discriminatory practices of the board. A statistical imbalance standing alone is not enough; official discrimination is required to invoke the protection of the Fourteenth Amendment. On this basis we upheld the exclusion by the district court of evidence of alleged discrimination in the public and private housing market of Cincinnati-acts over which the school board had no control. (Emphasis added.)
 
 
 44
 For these reasons I concur in Judge Merritt's opinion.
 
 
 
 [1]
 The plaintiffs in Bronson sought to avoid application of the doctrine of collateral estoppel by arguing significant changes in the law of school segregation during the decade 1965-1975. Specifically, they argued that intentional segregation in 1965 was defined in terms of the dominant purpose of school board decisions, and in 1975 was inferred from the natural and foreseeable consequences of a school board's actions
 The 1965 case at issue in Bronson was Deal v. Cincinnati Bd. of Educ., 369 F.2d 55 (6th Cir. 1966). There is no doubt that the 1968 Arnold court relied heavily on Deal for assessing the school board's liability. Deal was cited extensively for the proposition that plaintiffs must show more than statistical imbalance to prove liability; that is "there must also be present a quantum of official discrimination." JA 206, quoting Deal, 369 F.2d 55, 62. The Arnold court then noted that under Deal, "a showing of 'affirmative gerrymandering' of school districts would satisfy that necessary added quantum of official discrimination." The Court concluded:
 Fully aware of this posture of the law in the Sixth Circuit, we limited testimony at trial to that which would be relative to any case the plaintiffs might make to establish affirmative action on the part of the board which could be construed as discriminatory...." (emphasis added) JA 206.
 The Arnold plaintiffs alleged, and presented evidence to prove, that the school board of Akron had altered attendance zones, maintained traditional racial boundary lines as school district boundary lines, and created optional attendance zones with the intent of creating a segregated school system.
 Obviously, there may be some refinements in the expression of methods for proving intent during the decade separating the instant case and Arnold. The use of the words in Arnold "limited testimony ... to establish affirmative actions" could be interpreted as a slightly more difficult task than providing evidence of "natural and foreseeable consequences" from which intent could be inferred. But we also note that the Court was not requiring a confession of segregatory intent, but merely evidence of acts which could be construed as discriminatory. The Arnold judge was aware of general principles of tort that a person's intent resides in the natural and foreseeable consequences of his acts.
 The Bronson panel likewise did not deny that minor refinements had taken place in desegregation law. But the crucial burden of proving intent remained and policy considerations of finality overcame countervailing considerations of minor refinements in definitions of intent:
 We conclude that there has been no such change in the law since Deal as to prevent altogether the application of the doctrine of collateral estoppel to this case.
 525 F.2d at 348-49.
 Application of collateral estoppel does not prevent the use of any evidence of school board acts ruled upon in the prior litigation. Rather, as clarified by Judge Phillips in his concurrence to Bronson, such evidence may not be offered to contradict the already litigated findings of fact, directly or indirectly.
 
 
 [2]
 Although plaintiffs may be correct in describing schools with 30% to 40% white and 60% to 70% black students as "racially identifiable black schools," we can find no change in the law and no suggestion in any cases from this Court or the Supreme Court since 1968 that a school board acts with segregative intent by voluntarily drawing zone lines creating majority black schools in which whites constitute such a substantial minority. We also note that the school board has now closed these three schools
 
 
 [3]
 For an article developing this theory in more detail, see Levin & Morse, School Desegregation Litigation in the Seventies, 39 Law & Contemp, Prob. 50 (1975)