Paul R. RIDDICK, Jr., and Phelicia Riddick, Infants, by Paul R. RIDDICK, Their Father and Next Friend, Cynthia C. Ferebee, Johnny Ferebee, Infants, by Rev. Luther M. Ferebee, Their Father and Next Friend, Anita Fleming, Infant, by Blanche Fleming, Her Mother and Next Friend, Darrell McDonald and Carolyn McDonald, Infants, by Ramion McDonald, Sr., Their Father and Next Friend, Eric E. Nixon and James L. Nixon, Infants, by Patricia Nixon, Their Mother and Next Friend, Johnny Owens; Trent Owens; Myron Owens, Shawn Owens, and Antonia Owens, Infants, by Annette Owens, Their Mother and Next Friend; Paul R. Riddick, Rev. Luther M. Ferebee, Blanche Fleming, Ramion McDonald, Sr., Patricia Nixon, and Annette Owens, Plaintiffs,

v.

The SCHOOL BOARD OF the CITY OF NORFOLK Thomas G. Johnson, Jr., Dr. John H. Foster, Dr. Lucy R. Wilson, Jean C. Bruce, Cynthia A. Heide, Robert L. Hicks, Hortense R. Wells, Defendants.

Civ. A. No. 83–326–N.

United States District Court,
E.D. Virginia,
Norfolk Division.

July 9, 1984.

Henry L. Marsh, III, S.W. Tucker, Randall G. Johnson, Hill, Tucker and Marsh, Richmond, Va., Gwendolyn J. Jackson, Delk, James & Jackson, Norfolk, Va., Napoleon Williams, New York City, John O. Goss, Norfolk, Va., for plaintiffs.

Jack E. Greer, J. Anderson Stalnaker, M. Wayne Ringer, Williams, Worrell, Kelly & Greer, P.C., Norfolk, Va., for defendants.

## MEMORANDUM OPINION

MacKENZIE, Chief Judge.

### Procedural History of Recent Complaint

This suit was filed by the plaintiffs, parents of public school children, as a class action against the School Board of the City of Norfolk, Virginia, and the members thereof, on May 5, 1983. The suit challenges, on constitutional grounds, a new proposed pupil assignment plan (hereinafter "Proposed Plan") in which crosstown busing of elementary school children is curtailed. The Proposed Plan was adopted by the School Board on February 2, 1983 and is scheduled for implementation in the school year beginning September, 1984. Plaintiffs contend that the adoption of the Proposed Plan was racially motivated and that its implementation would violate the rights of the plaintiffs under the Fourteenth Amendment.

Defendants contend that the present plan, with its massive crosstown busing, has had the effect of resegregating the school system and that continuation of the present plan would result in even further resegregation. Defendants argue that the Proposed Plan was adopted, in large measure, to promote stability in the school system and thereby to ensure that the Norfolk school system remains as desegregated as possible over the long term.

### Past History of Proceedings

Desegregation litigation in Norfolk began in 1956, styled *Beckett v. School Board of the City of Norfolk,* before Judge Walter E. Hoffman. *Beckett,* renamed *Brewer v. School Board of the City of Norfolk,* became the individual docket responsibility of Judge John A. MacKenzie on July 7, 1971, and the district court decisions from that date, to the present, have all been those of Judge MacKenzie.

Following the decision in *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), *Brewer v. Norfolk School Board* was remanded to the District

Court by the Fourth Circuit Court of Appeals, with instructions to obtain from the Norfolk School Board a new desegregation plan which would give effect to *Swann.* *Brewer, sub nom., Adams v. School District No. 5, Orangeburg County, South Carolina,* 444 F.2d 99 (4th Cir.1971), *cert. denied,* 406 U.S. 933, 92 S.Ct. 1778, 32 L.Ed.2d 136 (1972).

Acting under that mandate, this Court received a revised desegregation plan from the School Board. This plan, modified in some respects by this Court, was instituted by an Order of this Court entered in July 1971. The plan utilized several different methods of pupil assignment including single school attendance zones, groupings and pairings of schools, and a majority-minority transfer provision. It also ordered crosstown busing as a technique to overcome the remaining vestiges of Norfolk's dual school system. That plan was approved by the Fourth Circuit with the minor change that crosstown busing was to be without cost to the students. This pupil assignment plan, which was subjected to periodic review over the next several years, is essentially the plan now in effect.

### Background

In July 1971, when the current desegregation plan was instituted and busing began, the population of Norfolk was 307,951 of which 70% (215,096) were white and 28% (87,261) were black. The Norfolk school system in 1970 enrolled 56,830 pupils, of which 57% (32,586) were white and 43% (24,244) were black.

By 1983, when the Proposed Plan was adopted by the School Board, the situation had changed significantly. The 1980 Census pegged the population of the City of Norfolk at 266,979 of which 61% (162,300) were white residents and 35% (93,987) were black residents. Total enrollment in the Norfolk school system stood at 35,540 in 1983. And in 1983, the racial composition of the school system was the following: 58% of the students (20,681) were black and 42% (13,327) were white. In the past twelve years then, there has been a 37%

loss in enrollment (21,290) and, specifically, a drop in the white student population of 59% (19,259).

These figures are noteworthy in two respects: first, that the racial composition of the school population had reversed itself, in 1983 it was 58% black, 42% white while in 1970 it had been 57% white and 43% black. Second, while the population of the City of Norfolk was 61% white in 1983, the school population was 42% white. This is to be compared with the situation in 1971 when the City's population was 70% white and the school population was 60% white.

In 1970 there were fifty-four elementary schools. In 1983 there were only thirty-six. This reflects the shrinking elementary school population as part of the 37% drop overall in school enrollment.

### The Proposed Plan

On February 2, 1983, the School Board of the City of Norfolk adopted the Proposed Plan which provides for a change in the system by which pupils in the elementary grades are assigned to schools. The Norfolk school system operates thirty-six elementary schools, and defines the elementary grades to include Kindergarten through Sixth Grade (K–6). (One of the thirty-six elementary schools, Ghent Elementary, is not now and will not become a neighborhood school. It offers an open classroom program and any student may apply for admission to it.) At the present time, there are fourteen single attendance zone schools (an increase of twelve since 1971) while the other elementary students in the school system are involved in the crosstown busing program. The Board has proposed instead that all elementary students attend single attendance zone schools (otherwise known, somewhat inaccurately, as neighborhood schools), the zones having been drawn to achieve the maximum amount of racial integration. The plaintiffs have not attacked the zones as drawn.

Under the Proposed Plan, crosstown busing for racial balance in Grades K–6 would be eliminated. The Proposed Plan would have the effect of increasing the number of

black racially identifiable elementary schools from 7 to 12. (This Court considers a school to be "racially identifiable" if the school population contains more than 70% of a particular race.)

The Proposed Plan includes a Majority-Minority transfer option ("M/M transfer"). No student would be required to attend a school in which his race constitutes more than 70% of the student body. Under the M/M transfer program, the student could transfer, at his parents' option, to a school in which his race constitutes less than 50% of the student body. The school administration has calculated that 10–15% of those eligible for the M/M transfer program would choose to use it in the first year and that up to 30–40% of those eligible would opt for it over the next five years. After considering the evidence of experts for both the plaintiffs and defendants, this Court finds that the school administration's figures are a reasonable estimate of the outcome of the M/M transfer program. This Court therefore finds that the School Board's figures—calculated on the basis that approximately 17–18% would opt to transfer—give a fair illustration of the effects of the M/M transfer program upon the elementary school population. After M/M transfers, only one elementary school would be over 70% white, i.e., Bayview (74%).

The Norfolk school system also includes Grades Seven-Twelve (7–12), located in eight Junior High Schools, five Senior High Schools and six Special Instruction Schools. These schools are not affected by the Proposed Plan. Under the Proposed Plan, crosstown busing will still be used to achieve racially mixed student bodies in those schools. The Proposed Plan creates a feeder pattern of elementary schools for the assignment of students to Junior High Schools. Each Junior High School will have a racially balanced student body as a result. In short, these schools will retain their present characteristics.

While the Proposed Plan also involves the creation of programs designed to improve achievement, parental involvement,

cross-cultural contacts and to ensure equal allocation of education resources, the major issues raised in this suit concerned the pupil assignment component.

### The 1975 Order in Beckett v. School Board: Its Meaning

■ As has been pointed out, the desegregation plan for the Norfolk school system was entered in July 1971 by the same judge as here presiding, and remains the framework for the organization of the school system. In 1972, 1973 and 1974, this Court received reports which described, in considerable detail, the operation of the school system. In particular, this Court reviewed the construction of new schools and the closing of other schools in 1972, 1973 and 1974. An application for the establishment of a transition school to aid school dropouts was opposed by the Beckett plaintiffs, but was nevertheless approved by this Court in August, 1972.

All of this activity culminated in an Order dated February 14, 1975, which is here fully set out:

LEOLA PEARL BECKETT, et al., Plaintiffs

v.

THE SCHOOL BOARD OF THE CITY OF NORFOLK, VIRGINIA, et al., Defendants

CIVIL ACTION NO. 2214
ORDER

It appearing to the Court that all issues in this action have been disposed of, that the School Board of the City of Norfolk has satisfied its affirmative duty to desegregate, that racial discrimination through official action has been eliminated from the system, and that the Norfolk School System is now "unitary," the Court doth accordingly

ORDER AND DECREE that this action is hereby dismissed, with leave to any party to reinstate this action for good cause shown.

/s/ JOHN A. MacKENZIE
United States District Judge
Dated: February 14, 1975
We ask for this:
/s/ Henry L. Marsh, III
Counsel for Plaintiffs
/s/ Allan G. Donn
Counsel for Defendants

The language of the Order of February 14, 1975 was fully agreed to by counsel for plaintiffs and defendants. Attorney's fees had been the only issue in the lawsuit for nearly three years before the entry of the Final Decree in February, 1975.

The Order of February 14, 1975, as appears on its face, was more than just a mere order of dismissal. Rather, the Order made specific findings

"... all issues in this action have been disposed of

"... that the School Board of the City of Norfolk has satisfied its affirmative duty to desegregate

"... that racial discrimination through official action *has been eliminated* from the system [emphasis added]

"... that the Norfolk School System is now 'unitary'...."

That Order was entered by the same judge who is now hearing this present action, after he had had the case in his charge for over four years and after he had been monitoring the operation of the school system for four years; at a time more than four years after he had ordered into effect the desegregation plan which today provides the structure by which the Norfolk school system is organized; at a time when the plan in effect had been unaltered in any appreciable respect since July, 1971, and which, incidentally, has remained essentially unaltered into 1984. No attempt to revive or reinstate the *Beckett* litigation was made during the nine years which passed from the time the Order was entered in 1975 until the present contest. This Court therefore cannot agree with the present efforts of plaintiffs to label the February 14, 1975 Order as a "Consent" Decree or an Order entered without the consideration of evidence to support its entry.

This Court finds that the Norfolk school system displays today, as it did in 1975, all indicia of "unitariness." In *Green v. County School Board*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), the Supreme Court explained that a dual system was one in which,

[r]acial identification of the system's schools was complete, extending not just to the composition of student bodies at the two schools but to every facet of school operations—faculty, staff, transportation, extracurricular activities and facilities. In short, the State, acting through the local school board and school officials, organized and operated a dual system, part "white" and part "Negro".

*Id.*, at 435, 88 S.Ct. at 1693. It has now been twelve years since crosstown busing was introduced and almost 30 years since the start of desegregation litigation in Norfolk. Every piece of evidence in this case points to the fact that the Norfolk school system is unitary: the Norfolk School Board is an integrated body, the Norfolk school administration is racially balanced, the racial composition of the faculty and staff is mixed, and the overwhelming majority of schoolchildren, of both races, on the elementary, junior and senior high school levels, attend schools whose student bodies are racially mixed. In addition, there has been no contention, nor could there be one, that the extracurricular activities, transportation network and school facilities are operated in a dual fashion. Finally, as noted elsewhere, there has been no challenge to any of the Board's actions in the *Beckett* litigation since some time before the 1975 Order was entered. *Compare, Clark v. Board of Education of the Little Rock School District*, 705 F.2d 265 (8th Cir.1983); *United States v. Texas Education Agency*, 647 F.2d 504 (5th Cir. 1981), *cert. denied*, 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 295 (1982).

In short, this Court finds that its Order of February 14, 1975, was carefully considered for every phrase it contained. The Order manifested this Court's determination that, as a factual matter, the Norfolk

system was free of discrimination and was unitary in 1975. This Court holds that such a finding was fully justified in 1975 and remains a finding which is today fully justified.

### Burden of Proof

■ What then is the effect of the 1975 Court Order? For the purposes of the present posture of this case, the effect of the Order is to shift the burden of proof from the defendant School Board to the plaintiffs, who must now show that the 1983 Proposed Plan results from an intent on the part of the School Board to discriminate on the basis of race.

It is well-established that a School Board which has maintained a dual school system has committed a constitutional violation. *E.g., Keyes v. School District No. 1,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). (The same principle, of course, applies to school systems which have been maintained as dual by operation of law. *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).) A dual system is one which is created by state authorities acting intentionally, with discriminatory purpose, to segregate the races. *See, Keyes,* 413 U.S. at 198, 93 S.Ct. 2692; *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 6, 91 S.Ct. 1267, 1271, 28 L.Ed.2d 554 (1971). When such a constitutional violation has been found, the offending school board is then under a continuing affirmative obligation to "take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green v. County School Board,* 391 U.S. 430, 437–38, 88 S.Ct. 1689, 1693–94, 20 L.Ed.2d 716 (1968); *Swann,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). A school board charged with the duty to dismantle an existing dual system bears the burden of justifying its action in light of that duty. *See, Columbus Board of Education v. Penick,* 443 U.S. 449, 460–61, 99 S.Ct. 2941, 2948, 61 L.Ed.2d 666 (1979); *Swann,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554.

A different situation, however, is present in the suit at bar. This Court, in its 1975 Order, specifically held that the Norfolk School Board had fully discharged its affirmative obligation to create a unitary system, that the school system had shed its dual, *de jure* segregated character and that the system was unitary. Consequently, the burden now falls upon these plaintiffs to show that the defendant School Board's actions were taken in violation of the Constitution. In order to make this showing, plaintiffs must prove that the Board acted with an intent to discriminate. *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Keyes,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548. The presence of discriminatory intent will not be inferred solely from the disproportionate impact of a particular measure upon one race. As the Supreme Court has made clear, "... official action will not be held unconstitutional solely because it results in a racially disproportionate impact. 'Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination.'" *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. at 264–265, 97 S.Ct. at 563, *quoting, Washington v. Davis,* 426 U.S. at 242, 96 S.Ct. at 2049. Moreover, it is clear that the existence of one race or substantially one race schools is not unconstitutional without a showing that such schools were created for the purpose of discriminating on the basis of race. *Keyes,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548; *See, Crawford v. Board of Education of the City of Los Angeles,* 458 U.S. 527, 102 S.Ct. 3211, 73 L.Ed.2d 948 (1982). Plaintiffs have attempted to carry their burden by pointing to various facts and circumstances regarding the adoption and effect of the Proposed Plan, specifically the following: that the impact of the Proposed Plan is such as to indicate discriminatory intent, that the procedures used by the Board in considering and adopting the Proposed Plan were suspect, that the Board improperly considered

the effect of "white flight", and that the Board's stated justifications were pretexts for discrimination.

This Court finds that plaintiffs have failed to satisfy their burden. As will be developed below, the evidence in this case falls short of demonstrating the requisite discriminatory intent.

(The plaintiffs have made several arguments with respect to the allocation of the burden of proof, all of which this Court rejects. First, plaintiffs argue that *Swann* requires the School Board to provide a nondiscriminatory justification as to why its Proposed Plan will create some schools with student bodies composed disproportionately of one race. However, *Swann* is inapplicable here. The questions resolved by the Supreme Court in *Swann* involved the fashioning of an appropriate remedy for the dismantling of a dual school system. In the case at bar, by contrast, the Norfolk school system has been held to be unitary and the question is whether the School Board has committed a constitutional violation in adopting the Proposed Plan. Second, plaintiffs contended that the principles announced in *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), require that this Court strictly scrutinize the Proposed Plan. As discussed in greater depth below, however, *Bakke* is inapplicable to this case.)

### School Resources Allocation

■ Plaintiffs have argued that as a result of the adoption of the Proposed Plan, and the emergence of a larger number of racially identifiable black schools than presently exists, the resources of the school system might be unequally distributed. Specifically, plaintiffs suggest that the greater concern would be shown to schools with a larger percentage of white enrollment and that the better equipment and better faculty would be diverted to these schools. Such an argument is hardly worth the review of the evidence that thoroughly defeats it.

The School Board of Norfolk is racially mixed, with four white members and three black members. The administration of the Norfolk school system is now in the capable hands of a very competent and integrated staff. The Superintendent of Schools, Dr. Gene R. Carter, is black. Two of the three Regional Assistant Superintendents are also black. There are 88 principals in the system, 59% are white, 41% are black. The faculty is likewise fully integrated, 56% white, 44% black. When *all* personnel are counted, including the maintenance staff, administration and faculty, the mix is 47% white, 52% black (1983 figures). Given that the staff is completely integrated and given that very qualified blacks are at the top of the organization, the fear that white students will stand to reap some benefit over black students is totally lacking in credence. And even though it is unlikely that additional oversight is necessary, the Proposed Plan specifically requires periodic judicial review of the allocation of educational resources, both human and material.

### Integration: New Plan as an Aid

■ A significant amount of expert testimony was solicited during the long trial of this case on the question of whether the scholastic achievement of students, black and white, is affected when the school they attend is racially mixed. In order to evaluate the Proposed Plan, and without attempting to balance the experts, let us assume that integration produces some positive impact upon achievement. Under this assumption, it becomes clear that the goal of any school plan must be to ensure that the greatest number of students of both races remain enrolled. And in fact, one of the purposes of the Proposed Plan is to stabilize elementary school population at its present ratio of black students and white students, roughly 60–40. There is some speculation that with the Proposed Plan in place the ratio might be narrowed to 55–45.

If the Proposed Plan is *successful* and the racial composition of the school popula-

tion stabilizes, the school administration will have considerably more white students for the purpose of integrating the system than it would have if the present plan continues in operation, according to various forecasts. As noted elsewhere in this opinion, even plaintiffs' experts recognize the distinct possibility that Norfolk will go the way of other central core cities whose school populations have become overwhelmingly minority, and that therefore Norfolk's student ratio may dwindle under the present plan to 75–25, black to white or 86–14, black to white, as in nearby Richmond, or even 90–10, black to white, as in Washington and Baltimore. This Court gives credence to these predictions. Clearly then, given that experts on both sides indicate that stability in the level of white enrollment is a desirable objective, and given the assumption that the achievement of all students may be improved by having an integrated education, the possibility that the Proposed Plan would increase the number of white students would be a strong point in its favor.

Let us suppose the Proposed Plan *fails* to stem the tide of "white flight" and the racial composition of the student population fails to stabilize at 55–45, or 60–40, black to white. In such a situation, the number of elementary schools that can be racially identified as black will necessarily increase since white students will not be available in sufficient numbers to maintain integration. Thus, the failure of the Proposed Plan to retain white students would produce a result no different from that of the continued operation of the present plan.

If stability in the ratio of white elementary students to black elementary students is a proper goal, then a plan which would achieve that goal must be appropriate. If the Proposed Plan is successful, it will produce such a result, but if it fails, the result will be no worse than the outcome which appears to be likely with the continued operation of the present plan—that is, resegregation. In short, the Proposed Plan represents a reasonable, voluntary attempt on the part of the School Board to ensure that the school system retains the greatest degree of integration over the long term.

### White Flight

The Court finds that the credible evidence in the case at bar reveals that there has been significant "white flight" from the Norfolk school system. Norfolk has experienced two types of "white flight": students who left the system after once having been enrolled in it, and families who have avoided settling in Norfolk but have instead settled in communities such as Virginia Beach or Chesapeake. The Court finds that, as a result of busing, the Norfolk school system has lost between 6000 and 8000 white students who otherwise would have been enrolled there.

The Court further finds that, as a result of this white flight, the Norfolk schools are faced with imminent resegregation. Dr. Crain, one of plaintiffs' key experts, stated in an unguarded moment that the school population of the City of Norfolk was undoubtedly moving towards a high ratio of black to white. The situation in Norfolk is not unlike that of other nearby cities which, like Norfolk, have an older central core. In Richmond, for example, the racial composition of the student population stands at 86% black, 14% white even though it began at approximately the same level as that in Norfolk. In short, it is clear that the Norfolk school system faces a serious problem brought on by the effects of white flight.

It is well settled that "white flight" cannot be used as a justification for the failure to comply with the Court Order to dismantle a dual school system. The commands of the Constitution may not bend to the popular will. *United States v. Scotland Neck Board of Education*, 407 U.S. 484, 92 S.Ct. 2214, 33 L.Ed.2d 75 (1972); *Davis v. East Baton Rouge Parish School Board*, 721 F.2d 1425 (5th Cir.1983). However, when the proper set of circumstances exists, white flight may be considered by the school board, and by the Court, in solving the integration equation. *See, Parent Association of Andrew Jackson High School*

v. Ambach, 598 F.2d 705, 720 (2d Cir.1979); Johnson v. Board of Education of Chicago, 604 F.2d 504, 516 (7th Cir.1979), vacated and remanded for consideration of subsequent developments, 449 U.S. 915, 101 S.Ct. 339, 66 L.Ed.2d 162 (1980); Stout v. Jefferson County Board of Education, 537 F.2d 800, 802 (5th Cir.1976); Higgins v. Board of Education of the City of Grand Rapids, 508 F.2d 779, 794 (6th Cir.1974). This Court finds, as further developed below, that this case presents circumstances which make consideration of "white flight" appropriate.

### Exodus of White Students as a Proper Criterion for Planning

■ Plaintiffs argue that the School Board bears the burden of proving that the Proposed Plan can survive strict scrutiny under the Equal Protection Clause because the Board allegedly employed racial criteria in designing the Proposed Plan. Specifically, plaintiffs claim that the Proposed Plan is suspect because it was developed, in part, to stem white flight and because it has the effect of creating twelve racially identifiable black schools. The plaintiffs cite Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), as support for this proposition.

The short answer to this argument is that the Proposed Plan does not create an impermissible classification. Under the Proposed Plan, the residence of the child will determine the school to which the child will be assigned. The Proposed Plan seeks to confer the benefit of neighborhood schooling upon all students in the City, and makes it available to all, regardless of race. See, Crawford, 458 U.S. at 537, 102 S.Ct. at 3217. The case at bar presents a clear instance of state action which addresses race related matters in neutral fashion. As the Supreme Court has stated, "A neighborhood school policy in itself does not offend the Fourteenth Amendment." Id. at 537, n. 15, 102 S.Ct. at 3217, n. 15; Swann, 402 U.S. at 28, 91 S.Ct. at 1282. Thus, on its face, the Proposed Plan does not establish a classification grounded on race. This distinguishes the case at bar from Bakke in which a medical school overtly considered applicants for admission differently according to race or ethnic origin.

■ Moreover, there is no evidence in this case to indicate that the Board used "residence" as a factor determining which school a child will attend as a pretext for discriminating on the basis of race. While the Board considered race when drawing up the boundary lines of the various attendance zones, it did so to ensure the maximum amount of integration in each school. Thus, it cannot be said that this line-drawing technique suggests that the Proposed Plan invidiously discriminates on the basis of race. And the fact that the Proposed Plan increases the number of racially identifiable black schools to twelve does not, standing alone, dictate a finding that an impermissible classification was established. See, Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597. The evidence has failed to show that the Board intended to use this Proposed Plan as a subterfuge for a deliberate attempt to discriminate on the basis of race.

■ Plaintiffs further argue that the Board's consideration of "white flight" was improper. This Court has already found that, as a factual matter, the Norfolk school system has been a victim of "white flight". Certainly, the mere fact that the Board considered the problems of white enrollment loss does not indicate that the Board acted with a discriminatory purpose when it adopted the Proposed Plan.

There is nothing inherently suspect in the Board's consideration of the "white flight" problem in 1983. As noted above, it is established that the possibility of white flight cannot justify a school board's failure to comply with court-ordered desegregation, nor would it excuse actions which would tend to make the court order unworkable, Scotland Neck Board of Education, 407 U.S. 484, 92 S.Ct. 2214, 33 L.Ed.2d 75; Davis, 721 F.2d 1425. However, those cases are distinguishable from the one at bar because the school board in

824

each of those cases was under court order to dismantle a *dual* school system. In Norfolk, by contrast, the school system was declared unitary in 1975 and the Board's continuing, affirmative duty to desegregate was discharged at that time. The School Board therefore did not act improperly in 1983 when it took into account the problems of white enrollment loss in considering a pupil assignment plan to ensure that the Norfolk school system would remain integrated over the long term. *See, Ambach*, 598 F.2d 705; *Higgins*, 508 F.2d 779. As the Sixth Circuit stated,

> ... It does not follow that a board must ignore the probability of white flight in attempting to formulate a *voluntary* plan which would improve the racial balance in the schools without at the same time losing the support and acceptance of the public.

*Higgins*, 508 F.2d at 794 (emphasis in original).

### Parental Involvement and the Proposed Plan

■ As noted above, plaintiffs have argued that the Proposed Plan was adopted and designed for the purpose of discriminating on the basis of race, and that the Board's stated justifications for adopting the Proposed Plan were mere pretexts. This Court has determined that the primary objective of the Board in adopting the Proposed Plan—providing a response to the threat posed by white flight to the long term integration of the Norfolk school system—was not a pretext for discrimination. This Court also finds that plaintiffs have failed to produce convincing evidence to substantiate their claim that the School Board's other key objective in adopting the Proposed Plan (i.e., increase the level of parental involvement) was pretextual.

One of the School Board's primary concerns has been the involvement of the parents in the process of education. The evidence produced in this case by both sides is absolutely clear that parental involvement at the elementary school level is essential

to the health and well-being of a school system. When asked whether involvement of parents in the school system was desirable, every witness—sociologists, educators, parents—responded affirmatively. Dr. Foster, one of plaintiffs' key experts, stated, "... today parental involvement is considered to be one of the most important ingredients for quality education." Tr. at 189. Dr. Albert Ayars, who served as Superintendent of the Norfolk school system until about a year ago, testified that parental involvement was "vital". Dr. Ayars pointed out that a nationwide Gallup Poll conducted in 1976 revealed that 65% of those responding believed that the "most significant factor" in a child's education was the involvement of parents.

While plaintiffs' acknowledged that parental involvement was important in making a school system successful, they attempted to defend the extent of parental involvement under the present plan. Plaintiffs also tried to intimate that programs to increase parental involvement which are to be implemented in connection with the Proposed Plan could work equally well under the current plan. These efforts fell short. Dr. Ayars, who was particularly well qualified to make such an assessment, stated that crosstown busing had "virtually destroyed" the PTA in Norfolk. PTA membership has fallen from approximately 15,000–20,000 to a mere 3,500. Dr. Ayars testified that, during his tenure, the school administration engaged in extensive efforts to improve the level of parental involvement and to increase the number of PTA members. One such effort was to offer free transportation to parents to enable them to attend meetings at their children's schools which were across town. However, these efforts were all to no avail.

At trial, individual parents testified that they lacked the transportation, and in many instances the energy, to make the trips to distant schools. These parents also testified, as did Dr. Ayars, conversely, that their interest and involvement would be revived if their children attended an elementary school in the neighborhood.

In short, this Court finds as a factual matter that the Norfolk School Board faced a critical problem caused by the precipitous decline in the level of parental involvement as a result of crosstown busing. Further, this Court has determined that the Proposed Plan constitutes a reasonable solution developed by the School Board to the difficult problem of declining parental involvement. Therefore, contrary to plaintiffs' argument, there is insufficient evidence from which to conclude that this objective of the School Board was, in fact, a pretext for discriminating on the basis of race.

### No Alternative Plan

 The School Board commissioned Dr. McLaulin to devise another plan as an alternative to the Proposed Plan which divides the City into attendance zones. The purpose of this alternative plan was to determine whether it would be feasible to retain a system of crosstown busing but at the same time to reduce the amount of time a child would spend on a bus each day. (The evidence proffered here showed that many children spend as much as 45 minutes on a bus traveling just one way to school.) This alternative plan was presented to the community at a series of public hearings held to aid the School Board in its decision-making process. The public was fully informed as to the principle underlying the alternative plan and as to the actual design of the alternative plan. However, the evidence produced in this case clearly established that absolutely no interest was expressed at the public hearings in the alternative plan. Therefore, the alternative plan was appropriately shelved. In short, this Court finds that the alternative plan was never a viable program and plaintiffs' arguments to the contrary, as well as their attempts to question the consideration which the alternative plan received, are completely unavailing.

### The Board's Procedures

 Plaintiffs have argued that the procedures used by the Board to consider and adopt the Proposed Plan were suspicious. Plaintiffs further contend that the suspicious nature of this process suggests that the Board acted with discriminatory purpose.

The Court finds, however, that the School Board's decision-making procedures were reasonable and do not indicate that the Board acted with discriminatory intent. There is no evidence of clandestine action on the part of the Board, or even the hint that any took place. Indeed, the facts are to the contrary. The Board established a special committee, the Ad Hoc Committee, to investigate the matter; later, a committee of the whole Board considered the matter. The Board solicited studies and opinions from further experts (Doctors Green, Edmonds, Lightfoot, Armor) as to various problems facing the school system and as to possible solutions. The Board held a series of six public hearings at different sites throughout the City during which the comments of the community were sought and received. The Board requested the opinions and advice of Dr. Ayars and Dr. Carter as well as those of their staffs. Plaintiffs' criticisms, made with the clear vision of hindsight, amount to no more than a claim that the Board failed to meet a standard of near-perfection in its decision-making process. In short, plaintiffs' criticisms of the Board's procedures do not, considered separately or in combination, lead to the conclusion or even amount to a suggestion that the Board was in fact acting with an intent to discriminate on the basis of race.

### Housing

 Plaintiffs have argued that those neighborhood schools which would be racially identifiable as black under the Proposed Plan are those schools which are located in housing projects or areas of subsidized housing, and that therefore the official actions of the housing authorities have, in large part, determined where the children of the residents of those projects will attend school. However, plaintiffs' argument does not lead to a finding that the

School Board has acted with discriminatory purpose in the adoption and design of the Proposed Plan.

All of the evidence points out that the slum clearance projects undertaken by the Norfolk Redevelopment and Housing Authority ("NRHA"), and any other agency involved with housing, beginning in the 1950's did, in fact, eliminate areas which were truly slums. The abominable living conditions in those slums were made even worse by the crowding of several families into units designed for single family habitation. These slum areas were occupied by those on the lowest rung of the economic ladder, many of whom were black. Therefore, when the slums were cleared, most of those who were displaced were black. The cleared slum areas became the sites of modern housing projects which were, by law, intended to house low income families; space in those projects was, again by law, to be offered first to those who had been displaced by the demolition of the slum areas.

Today, Norfolk's fifteen public housing projects and seven subsidized housing projects are occupied almost exclusively by black residents. These projects house approximately 25% of Norfolk's black families and, by deduction, 25% of Norfolk's black school children. However, it defies logic to suggest that because the City of Norfolk and the appropriate City agencies had undertaken an aggressive and progressive plan to eradicate unlivable slums and to replace them with modern, affordable living spaces for low income residents, the School Board is responsible in some way for the fact that under the Proposed Plan, the racially identifiable black schools are located in close proximity to those projects. No plaintiff expert witness suggested that the School Board should have insisted to the City, or to the appropriate City agencies (e.g., the NRHA), that the statutory requirement that those displaced have priority in the assignment of rental units be ignored, that some of the units be made available to those of greater financial means, that the long waiting lists of prospective black tenants (which exist even

today) be disregarded or that some of the new accommodations be set aside and held, even if unoccupied, for white residents only. As Justice Powell wrote in *Columbus Board of Education v. Penick,*

> There are unintegrated schools in every major urban area in the country that contain a substantial minority population. This condition results primarily from familiar segregated housing patterns, which—in turn—are caused by social, economic, and demographic forces for which no school board is responsible
> ....

443 U.S. 449, 480, 99 S.Ct. 2941, 2988, 61 L.Ed.2d 666 (1979); *Cf., Bell v. Board of Education, Akron Public Schools,* 683 F.2d 963 (6th Cir.1982) (discrimination in housing by governmental agencies not imputable to school authorities otherwise innocent of segregative intent). And as Professor Alexander Bickel stated, in a passage quoted by the Court in *Penick,*

> In most of the larger urban areas, demographic conditions are such that no policy that a court can order, and a school board, a city or even a state has the capability to put into effect, will in fact result in the foreseeable future in racially balanced public schools. Only a reordering of this environment involving economic and social policy on the broadest conceivable front might have an appreciable impact.

*Id.,* 443 U.S. at 480, 99 S.Ct. at 2988.

The focus of the school desegregation cases has been upon the elimination of dual *school* systems. As Chief Justice Burger stated in *Swann,*

> We are concerned in these cases with the elimination of the discrimination inherent in the dual school systems, not with myriad factors of human existence which can cause discrimination in a multitude of ways on racial, religious, or ethnic grounds. The target of the cases from *Brown I* to the present was the dual school system. The elimination of racial discrimination in public schools is a large task and one that should not be retarded by efforts to achieve broader purposes lying beyond the jurisdiction of school

authorities. One vehicle can carry only a limited amount of baggage.

It would not serve the important objection of *Brown I* to seek to use the school desegregation cases for purposes beyond their scope, although desegregation of schools ultimately will have impact on other forms of discrimination.

402 U.S. at 22–23, 91 S.Ct. at 1279.

### Conclusion

Briefly stated, this Court holds as follows:

1. The 1975 Order entered in *Beckett* is to be given full force and effect. It was signed four years after this Court ordered crosstown busing, and after this Court had overseen the operation of the school system for four years. The Order was entered only after due reflection and consideration by this Court. And it is clear, moreover, that the school system displays the various indicia of a unitary system.

2. As a result of the proper findings made in the 1975 Order, that the School Board has satisfied its affirmative duty to desegregate and that the system is unitary, the plaintiffs in this action bear the burden of proof. Plaintiffs must show that the School Board's actions in adopting the Proposed Plan were taken with an intent to discriminate on the basis of race.

3. It is clear to this Court that plaintiffs have failed to sustain their burden. The School Board had two principal reasons for adopting the Proposed Plan—to try to meet the threat posed by white flight to the integration of the school system over the long term and to attempt to increase the level of parental involvement. The Court finds that there is a factual basis for the School Board's concerns, that the solution proposed by the Board is a reasonable one and was a result of reasoned consideration, and further that the Board's stated justifications for adopting the Proposed Plan were not pretextual. In addition, this Court finds that the Board's procedures in adopting the Proposed Plan were not flawed in any manner which might indicate that the Board was acting with discriminatory purpose.

4. Plaintiffs have attempted to link the actions of the School Board with those of the Norfolk housing agencies for the purpose of establishing that the School Board acted improperly in designing and adopting the Proposed Plan. This Court concludes, for the reasons stated above, that plaintiffs' argument on this point must also fail.

5. Plaintiffs' motion to set aside the Order of February 14, 1975 in *Beckett v. School Board of the City of Norfolk* is DENIED.

### ORDER

In accordance with a Memorandum Opinion this day filed, this Court finds

1. That the Pupil Assignment Plan adopted by the School Board of the City of Norfolk on February 2, 1983, is not unconstitutional;

2. That the prayer of plaintiffs for injunctive relief is DENIED; and

3. Plaintiffs' motion to set aside the Order of February 14, 1975 in *Beckett v. School Board of the City of Norfolk* is DENIED.

It is so ORDERED.