784 F.2d 521
 54 USLW 2428, 30 Ed. Law Rep. 1075
 Paul R. RIDDICK, Jr., and Phelicia Riddick, infants, by Paul
R. RIDDICK, their father and next friend, Cynthia C.
Ferebee, Johnny Ferebee, Gary Ferebee, and Wilbert Ferebee,
infants, by Rev. Luther M. Ferebee, their father and next
friend, Anita Fleming, infant, by Blanche Fleming, her
mother and next friend, Darrell McDonald and Carolyn
McDonald, infants, by Ramion McDonald, Sr., their father and
next friend, Eric E. Nixon and James L. Nixon, infants, by
Patricia Nixon, their mother and next friend, Johnny Owens;
Trent Owens; Myron Owens, Shawn Owens, and Antonio Owens,
infants, by Annette Owens, their mother and next friend;
Paul R. Riddick, Rev. Luther M. Ferebee, Blanche Fleming,
Ramion McDonald, Sr., Patricia Nixon, and Annette Owens, Appellants,
v.
The SCHOOL BOARD OF the CITY OF NORFOLK, Thomas G. Johnson,
Jr., Dr. John H. Foster, Dr. Lucy R. Wilson, Jean
C. Bruce, Cynthia A. Heide, Robert L.
Hicks, Hortense R. Wells, Appellees.
The Lawyers' Committee for Civil Rights Under Law, Amicus Curiae.
 No. 84-1815.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 8, 1985.
Decided Feb. 6, 1986.
Rehearing and Rehearing En Banc Denied March 19, 1986.
 
 Henry L. Marsh, III (S.W. Tucker, Randall G. Johnson, Hill, Tucker & Marsh, Richmond, Va., on brief), and Julius Levonne Chambers (James M. Nabrit, III, Napoleon B. Williams, Jr., New York City, Gwendolyn Jones Jackson, Delk, James & Jackson, Norfolk, Va., Elizabeth Turley, Little, Parsley & Cluverius, Richmond, Va., on brief), for appellants.
 Jack E. Greer (J. Anderson Stalnaker, M. Wayne Ringer, Williams, Worrell, Kelly & Greer, Philip R. Trapani, Norfolk, Va., on brief), for appellees.
 William Bradford Reynolds, Asst. Atty. Gen. (Charles J. Cooper, Deputy Asst. Atty. Gen., Michael Carvin, Dept. of Justice, Washington, D.C., on brief), for amicus curiae U.S.
 (Fred N. Fishman, New York City, Robert H. Kapp, Washington, D.C., Norman Redlich, William L. Robinson, Conrad K. Harper, Eleanor M. Fox, Richard E. Meade, Simpson Thacher & Bartlett, New York City, on brief), for amicus curiae The Lawyers' Committee for Civil Rights Under Law.
 Before WIDENER, SPROUSE and ERVIN, Circuit Judges.
 WIDENER, Circuit Judge:
 
 
 1
 The plaintiffs, Paul R. Riddick and others, appeal the district court's refusal to invalidate a new pupil assignment plan for the elementary schools (grades K-6) of the City of Norfolk. 627 F.Supp. 814. Under the new assignment plan, mandatory cross-town busing, required at first by court order in 1971, is abolished. In its place, students are assigned in most instances to neighborhood schools, with a transfer provision with free transportation for minority students who desire it.[1] Plaintiffs contend that adoption of the new assignment plan was racially motivated and that its implementation violates their constitutional rights under the Fourteenth Amendment to the United States Constitution. We affirm.
 
 I. Background
 
 2
 To better understand the issues involved in the instant appeal, the history of litigation arising out of racial segregation in Norfolk's public schools should be examined. Prior to the Supreme Court's opinion in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), segregation of public schools in Norfolk and elsewhere in Virginia was sanctioned by state law.
 
 
 3
 In 1956, litigation began which sought the integration of Norfolk's public schools. Beckett v. School Board of the City of Norfolk, 148 F.Supp. 430 (E.D.Va.), aff'd 246 F.2d 325 (4th Cir.), cert. den. 355 U.S. 855, 78 S.Ct. 83, 2 L.Ed.2d 63 (1957). Following intervention of additional plaintiffs, the case became styled Brewer v. School Board of the City of Norfolk, see 349 F.2d 414 (4th Cir.1965) (referred to herein as Brewer or Beckett).
 
 
 4
 In 1970, this court upheld a finding that the Norfolk school board operated a dual school system based on race. Brewer, 434 F.2d 408, 410 (4th Cir.), cert. den. 399 U.S. 929, 90 S.Ct. 2247, 26 L.Ed.2d 796 (1970). The district court was ordered to implement a plan in order to achieve a unitary school system in Norfolk. Brewer, supra, at 412. Following the Supreme Court's decision in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), the court again remanded Brewer to the district court for implementation of a desegregation plan conforming with Swann 's expanded scope of remedies. Brewer, sub nom. Adams v. School District No. 5, Orangeburg Co., S.C., 444 F.2d 99 (4th Cir), cert. den. 404 U.S. 912, 92 S.Ct. 230, 30 L.Ed.2d 186 (1971).
 
 
 5
 Following remand, the district court adopted a desegregation plan which utilized pairing and clustering of schools in Norfolk, as well as cross-town busing in the assignment of students to accomplish desegregation. This court affirmed implementation of the busing plan with a modification of the plan to provide for free transportation for those students bused. Brewer v. School Board of the City of Norfolk, 456 F.2d 943 (4th Cir.), cert. den. 406 U.S. 933, 92 S.Ct. 1778, 32 L.Ed.2d 136 (1972).
 
 
 6
 Three annual reports by the school board were reviewed by the district court following its 1971 order. In 1975, the district court determined that racial discrimination had been eliminated from the Norfolk school system and that the school system had become unitary. Therefore, the district court dismissed the Beckett action. The full text of that order is:
 
 ORDER
 
 7
 It appearing to the Court that all issues in this action have been disposed of, that the School Board of the City of Norfolk has satisfied its affirmative duty to desegregate, that racial discrimination through official action has been eliminated from the system, and that the Norfolk School System is now "unitary," the Court doth accordingly
 
 
 8
 ORDER AND DECREE that this action is hereby dismissed, with leave to any party to reinstate this action for good cause shown.
 
 
 9
 /s/ JOHN A. MacKENZIE
 
 United States
 District Judge
 Dated: February 14, 1975
 We ask for this:
 
 10
 /s/ Henry L. Marsh, III
 
 Counsel for Plaintiffs
 
 11
 /s/ Allan G. Donn
 
 Counsel for Defendants
 
 12
 No appeal was taken from the order dismissing the case. No legal action was taken with respect to the desegregation of Norfolk's public schools from 1975 until the present action was filed in 1983.
 
 
 13
 Although no longer under court order, the Norfolk school board continued cross-town busing until 1983. At that time, the board concluded that declining white enrollment figures required that the busing plan be modified to abolish mandatory busing of elementary school students. In its stead, the board adopted a pupil assignment plan based on geographic zones for its elementary schools. The board sought district court approval of its proposed plan by filing a motion to reinstate the Beckett case and by filing a civil action, School Board of the City of Norfolk v. Bell, et al, No. 83-225-N (E.D.Va.1983). The Riddick plaintiffs (those presently before the court) thereafter filed this class action suit challenging the proposed pupil assignment plan. The board voluntarily dismissed the Bell case and withdrew its motion in the Beckett case. The issues raised in those proceedings are raised here.
 
 II. Facts
 
 14
 In 1970, the population of Norfolk was 307,951, 70% (215,069) white and 28% (87,261) black. The Norfolk public schools enrolled 56,830 pupils during the 1969-70 school year, 57% (32,586) of those students being white and 43% (24,244) being black.
 
 
 15
 In 1980, the population of Norfolk had declined more than 11% to 266,979, 61% (162,300) white and 35% (93,987) black. The public school enrollment, racially and otherwise, had even more drastically changed. By the 1980-81 school year, enrollment had shrunk to 36,643, a 37% drop in overall enrollment. Even more startling, the white enrollment that year was 15,629 or 42.6% of the total school enrollment. Black enrollment (21,014) now comprised 57.4% of the total school enrollment. While the overall percentage of white enrollment had dropped 14.4%, white school enrollment had dropped 52%, although the white population decreased only 24%. By 1983, school enrollment was down to 34,803, 58% (20,191) black and 42% (14,611) white.
 
 
 16
 Largely because of the drop in overall student enrollment during those years, 17 elementary schools were closed. Most of those schools closed were located in predominantly black neighborhoods.
 
 
 17
 Since 1971, the school board had used a 70%-30% ratio in assigning students under the busing plan. A school was considered as a racially identifiable black school if its enrollment consisted of more than 70% black students. In 1977, one elementary school was over 70% black. By 1981, seven elementary schools were over 70% black. During this same period, parental involvement, as shown by PTA membership, dropped dramatically, from 15,000-20,000 down to 3,500.
 
 
 18
 Alarmed about the continued loss of white students from the public school system and the drastic drop in parental involvement, the school board appointed an ad hoc committee in 1981 to examine the feasibility of reducing cross-town busing. The committee members initially were Mrs. Jean Bruce, Mrs. Hortense Wells, Tommy Johnson, Robert Hicks, and John Foster. It was later expanded to a committee of the whole. The Committee members visited other school systems to study their desegregation programs, including the Shreveport, La. and Richmond, Va. school systems. A task force was appointed to produce data for the committee.[2] The committee communicated with experts in the field for consultation, including Dr. Ron Edwards, Dr. Robert Green, Dr. Sarah Lightfoot, and Dr. David Armor. Three members of the ad hoc committee favored a proposal ending busing of elementary school students. Dr. Foster opposed the change.
 
 
 19
 The board engaged Dr. Armor to prepare a report on the problems of continued integration of Norfolk's schools. Armor concluded that mandatory busing had led to significant white flight and that if busing continued, the Norfolk school system would be 75% black by 1987. At the point of 75% black, no matter in which year it occurred, of course the average black child could not expect to be educated in a desegregated school according to the 70/30 definition used and which Armor stated was consistent with most definitions of segregation. Busing, he said, had aided the obtainment of racial balance but such balance was of little aid as the system was resegregating with the rapid loss of white students. He concluded that under such circumstances busing did not significantly aid black academic achievement and that white student enrollment would stabilize if busing were eliminated.
 
 
 20
 The board held a series of public hearings to present the new pupil assignment plan.[3] Groups both opposed to and supportive of the new plan presented their views at these hearings. Supporters of the plan were concerned with the lengthy transportation of their children, with problems inherent with having their children in schools far from their homes, with lack of parental involvement in these distant schools and with a general feeling that busing was not working. Those opposed to changing the busing plan expressed concerns over the number of schools that would become almost completely black, the adverse effects of such separation of the races, fear that the segregation of the past was returning and concern that busing was needed to guarantee equal allocation of both material and human resources.
 
 III. The Proposed Plan
 
 21
 On February 2, 1983, the Norfolk school board adopted the "Proposal For a Voluntary Stably Desegregated School System" by a vote of 5-2.[4] Under the plan, cross-town busing of elementary school students was eliminated.[5] All of the elementary schools became single attendance zone schools (neighborhood schools). Those single attendance zones were gerrymandered so as to achieve maximum racial integration.[6] Students attending any certain elementary school were fed into a certain one of eight junior high schools. Under this feeder plan, all the junior high schools were fully integrated racially. The maximum black/white ratio was 72/28, and the minimum 56/44.
 
 
 22
 Under the plan, twelve of Norfolk's thirty-six elementary schools will be 70% or more black, compared to four under the busing plan presently in effect. Of those twelve schools, ten will be 95% or more black. Six schools will become 70% or more white.[7]
 
 
 23
 The plan contains a majority-minority transfer option, described in Swann, 402 U.S. p. 26, 91 S.Ct. p. 1281, as a "useful part of every desegregation plan." Under this option, any student assigned to attend a school at which his race constitutes 70% or more of the student body can transfer to a school where his race constitutes less than 50% of the students. The plan provides for free transportation for those students choosing such a transfer. The school board estimates that 10-15% of eligible students would take advantage of the M/M transfer the first years. Five year projections show as many as 40% of the students may opt for M/M transfers. If 20% of those eligible black students opt for M/M transfer, only one school would remain more than 70% white. Some of the ten schools with 95% or more black pupils would have smaller percentages of black students but all would yet be above 95%.
 
 
 24
 The plan also provides for multi-cultural programs to expose students in racially isolated elementary schools to students of other races. A parental involvement program is also included.
 
 
 25
 A Plan II was drawn up by Dr. John Foster which reduced the length of bus rides for elementary students but increased the number of students that would be bused. No school would have been less than 25% of any one race. Plan II would have required the redrawing of all of the attendance zones in the school system. That plan was also presented at the public hearings. No support was expressed for Plan II at those hearings, and the plan was not adopted by the board. Plaintiffs do not here seek an adoption of Plan II in lieu of the plan adopted; they seek a return to the original busing plan.
 
 IV. District Court Opinion
 
 26
 On July 9, 1984, the district court upheld the constitutionality of Norfolk's proposed plan for elementary school assignments. As a preliminary matter, the court held that its 1975 ruling that Norfolk's school system was unitary was fully supported by the record and remained in effect at the time of this suit. In so concluding, the court rejected plaintiffs' argument that the 1975 order was merely a consent decree and therefore had no effect upon these plaintiffs.
 
 
 27
 The court held that the 1975 order had the effect of placing the burden of proof on the plaintiffs instead of the defendant school board. The burden was on the plaintiffs to show that the proposed plan was adopted by the board with an intent to discriminate on the basis of race. Upon entry of the 1975 order, the court reasoned, the Norfolk school board had discharged its affirmative duty to desegregate its schools. Thus, as of the 1975 order, the school board was no longer operating a de jure dual school system with a concomitant duty to desegregate as required by Brown and later cases. Because no de jure discrimination was present, the plaintiffs were required to show that the school board acted with an intent to discriminate as required by Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), and Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).
 
 
 28
 Finally, the district court found that the plaintiffs had not satisfied their burden of proving discriminatory intent. In reaching that conclusion, the court reviewed the six aspects of public education which must be free from racial discrimination before a system can become unitary: faculty, staff, transportation practices, extracurricular activities, facilities and pupil assignment. Green v. County School Board, 391 U.S. 430, 435, 88 S.Ct. 1689, 1692, 20 L.Ed.2d 716 (1968).
 
 
 29
 There follows, briefly stated, the district court's findings of fact and conclusions of law in its analysis of that question.
 
 
 30
 Norfolk's school board was racially mixed, composed of four white and three black members. The superintendent of the schools, Dr. Gene R. Carter, was black. Two of the three Regional Assistant Superintendents were black. The faculty was 56% white and 44% black. Black personnel comprised 52% of the total. Such data reflected that the faculty and staff were fully integrated. Relying on this, the district court rejected plaintiffs' allegation that school resources would inequitably be distributed with predominantly white schools receiving a greater percentage of these resources. In addition, the court noted the new plan itself required periodic judicial review of the school board's allocation of educational resources.
 
 
 31
 The court found credible the testimony of expert witnesses that Norfolk would continue to lose white students because of busing and that over a period of time the school system would become predominantly black. Norfolk's school system might well become 90% black as are systems in cities such as Baltimore and Washington, D.C., or 86% black as in Richmond, resulting in resegregation regardless of busing and pupil assignment plans. The court found that Norfolk had lost between 6000-8000 white students because of busing.[8] As a result of this white flight, Norfolk's schools were resegregating under the busing plan.
 
 
 32
 The district court recognized that white flight cannot be used as a reason for failure to dismantle a dual school system. United States v. Scotland Neck Board of Education, 407 U.S. 484, 92 S.Ct. 2214, 33 L.Ed.2d 75 (1972). The consideration of white flight in devising a voluntary plan to improve the racial balance of the schools was proper however. Higgins v. Board of Education of City of Grand Rapids, 508 F.2d 779 (6th Cir.1974). It found the board's consideration of white flight was proper because it was voluntarily attempting to keep its schools stably integrated. It was under no affirmative court order to desegregate at the time. Such consideration was not a pretext for racial discrimination. In sum, the district court found that keeping white students in the schools was necessary to insure a desegregated education, and, since the white students had been lost because of busing, the board was justified in reducing the busing in an effort to keep white students.
 
 
 33
 Likewise, the court found as a fact and credited the board's second reason for adoption of the proposed plan, that of seeking an increase in the level of parental involvement. All the evidence at trial, both from plaintiffs and the board, indicated that parental involvement at the elementary level was essential to the well-being of the school system. Because of busing, however, parental involvement through the vehicle of the PTA had been virtually destroyed. PTA enrollment had dropped from approximately 15,000-20,000 members to 3,500 members. During this period of declining enrollment, the board had tried to bolster membership by various means, including providing free transportation to parents to enable them to attend meetings at their children's school. The board's efforts were unsuccessful. Evidence at trial convinced the court that parental involvement declined as a result of their children attending schools across town instead of close to their home with resulting easy access of parents to the school. The proposed plan offered by the board represented a reasonable proposal to try to solve the dilemma of declining parental involvement.
 
 
 34
 Based upon the above reasoning and fact findings, the court rejected the plaintiffs' contention that the proposed plan was adopted for the purpose of racial discrimination. It found that neither the board's purpose of trying to create a stably integrated student body nor its effort to increase necessary parental involvement was pretextual. Therefore, the district court found that plaintiffs had not carried their burden of proving intent to discriminate on the part of the school board.
 
 
 35
 The court also rejected the plaintiffs' claim that discriminatory intent can be inferred from the procedure used by the board in considering and adopting the proposed plan. It found that the board had followed a thorough and reasonable procedure, including creating a special committee, hiring experts and holding six public hearings throughout the community. It also found no basis in fact for the plaintiffs' claim that the board had acted in concert with local housing authority officials to determine the location of housing projects[9] and thereby determine the location of black elementary schools.
 
 
 36
 Plaintiffs appeal the district court's order rejecting their claim of intentional discrimination by the school board in adopting the proposed plan for neighborhood elementary schools in Norfolk. Specifically, they claim error in (1) the district court's holding that the 1975 order declaring the Norfolk school system to be unitary remains effective and applicable to this lawsuit; (2) the district court's conclusion that Norfolk's school system is in fact unitary; (3) the court's conclusion that the burden of proof in this action is upon the plaintiffs to prove intent to discriminate by the school board; and (4) the court's holding that the school board's actions were not motivated by racial criteria in violation of the Fourteenth Amendment. We will consider these arguments in turn.
 
 V. Effect of 1975 Order
 
 37
 In 1975, the district court in Beckett found that the Norfolk school system had "satisfied its affirmative duty to desegregate, that racial discrimination through official action [had] been eliminated from the system and that the Norfolk School System [was] 'unitary'." That holding marked the culmination of almost two decades of desegregation litigation in Norfolk. The Beckett litigation was effectively completed in 1971 when a busing order was entered. Following its entry, the district court monitored the school system for four years and became satisfied that the system had ridded itself of racial discrimination. Being satisfied that the plan had succeeded in eradicating segregation, the court dismissed the suit.
 
 
 38
 Plaintiffs contend that the 1975 order is no more than a consent order entered by the parties and therefore is not binding upon them. While the plaintiffs are correct in stating that, as a general rule, all consent orders do not necessarily have collateral estoppel effect, United States v. International Bldg. Co., 345 U.S. 502, 73 S.Ct. 807, 97 L.Ed. 1182 (1953), we believe that the 1975 order was not a compromise judgment. Id. at 506, 73 S.Ct. at 809.[10] As previously noted, that order culminated a lengthy and hotly contested lawsuit which resulted in the ending of segregated schools in Norfolk. The court monitored the desegregation plan for several years and, after finding that all of the claims raised in the complaint had been disposed of, dismissed the case. Because the court made findings on the merits of the plaintiffs' claims for relief, the order is not a consent order in settlement of a suit but is an order on the merits of the same. The fact that the parties agreed to the order does not alter that conclusion. International Bldg. Co., supra, at 506, 73 S.Ct. at 809. Unlike an order compromising a claim by agreement, the district court in the order now contested ruled on the questions of law and fact in dispute. Because the order represents the court's findings on the issues raised and not a compromise entered into by the parties, the consent order exception to application of collateral estoppel principles is inapplicable here.
 
 
 39
 Such a conclusion is consistent with the duty placed upon district courts in disposing of school desegregation cases. A district court is under an obligation to retain jurisdiction over the school system under a proposed integration plan to determine its effectiveness in achieving desegregation. Swann, supra, 402 U.S. at 21, 91 S.Ct. at 1278; Green, supra, 391 U.S. at 439, 88 S.Ct. at 1695; Raney v. Board of Education, 391 U.S. 443, 449, 88 S.Ct. 1697, 1700, 20 L.Ed.2d 727 (1968). It is required to retain jurisdiction until it determines that the school system has become unitary. United States v. Texas Ed. Agency, 647 F.2d 504, 508 (5th Cir.1981). Such a determination should only occur after the district court has retained jurisdiction over the school system to make certain that "it is operated in a constitutionally permissible fashion so that the goal of a desegregated, non-racially operated school system is rapidly and finally achieved." Raney, supra, 391 U.S. at 449, 88 S.Ct. at 1700; Felder v. Harnett Co. Board of Education, 409 F.2d 1070, 1075 (4th Cir.1969). The district court followed the monitoring procedure as it was required to do. It did not end the litigation until it was satisfied that the school system was free from racial segregation. Such active participation by the court belies any argument that the 1975 order is anything less than a judgment on the merits.
 
 
 40
 Plaintiffs next contend that the 1975 order should be given no effect here because the United States, a party to the prior action, was not given notice of, nor consented to, that order. Plaintiffs have no standing to raise such a claim, especially since the United States does not challenge the 1975 order. See generally the government's brief 12-15.
 
 
 41
 We likewise reject plaintiffs' argument that the 1975 order is not to be given effect here because it was not a final order. That contention derives from language in the order that the action "is dismissed, with leave to any party to reinstate this action for good cause shown." If we consider that only final orders are to be given preclusive effect, Kaspar Wire Works, Inc. v. Leco Engineering & Mach., 575 F.2d 530, 537-8 (5th Cir.1978),[11] we find no violation of that maxim here. The 1975 order concluded a complex legal battle of almost twenty years' duration in which all parties had ample opportunity to be heard. That order could have been appealed under 28 U.S.C. Sec. 1291 if the parties so chose. They did not. The order finally disposed of all remaining issues in the litigation, and it could have been appealed. As such, preclusion principles attach.
 
 
 42
 The fact that the district court gave the parties an opportunity to reinstate the cause upon the docket with a showing of good cause does not alter our holding. That language is not dissimilar to the language in Fed.R.Civ.Pro. 60(b) which allows parties to seek relief from a judgment under certain prescribed circumstances. Rule 60(b) specifically provides, however, that such opportunity to seek relief from judgment does not affect the finality of an order. We believe that the same reasoning should apply here.
 
 
 43
 Plaintiffs further argue that the 1975 order should not be binding on them because the district court did not comply with Fed.R.Civ.Pro. 23(e) by giving notice to members of the class prior to dismissal or compromise of the class action. We have found that the 1975 order is not a voluntary dismissal or compromise but instead represents an adjudication on the merits. Thus, such an order is not subject to 23(e)'s notice requirements. See Shelton v. Pargo, Inc., 582 F.2d 1298, 1300 n. 1 (4th Cir.1978); Hutchinson v. Fidelity Inv. Assoc., 106 F.2d 431 (4th Cir.1939); Wright & Miller, Federal Practice and Procedure, 1972, Sec. 1797, p. 235-236.
 
 
 44
 Once a court decides an issue of law or fact necessary to its judgment, that decision can be binding upon a party to it if the party was given a "full and fair opportunity to litigate [the] issue in the earlier case." Allen v. McCurry, 449 U.S. 90, 94-5, 101 S.Ct. 411, 414-15, 66 L.Ed.2d 308 (1980). The Court has summarized its thoughts in Montana v. United States, 440 U.S. 147, 153-4, 99 S.Ct. 970, 973-74, 59 L.Ed.2d 210 (1979):
 
 
 45
 A fundamental precept of common-law adjudication, embodied in the related doctrines of collateral estoppel and res judicata, is that a right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction ... cannot be disputed in a subsequent suit between the same parties or their privies....' Southern Pacific R. Co. v. United States, 168 U.S. 1, 48-49 [18 S.Ct. 18, 27, 42 L.Ed. 355] (1897). Under res judicata, a final judgment on the merits bars further claims by parties or their privies based on the same cause of action. (Citations omitted) Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation. (Citation omitted) Application of both doctrines is central to the purpose for which civil courts have been established, the conclusive resolution of disputes within the jurisdictions. (Citation omitted) To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions. (Footnote omitted)
 
 
 46
 The principles of collateral estoppel or issue preclusion are applicable to school desegregation cases. Los Angeles Branch NAACP v. L.A. Unified School Dist., 750 F.2d 731 (9th Cir.1985); Bronson v. Board of Education of City School Dist., 687 F.2d 836 (6th Cir.1982); 525 F.2d 344 (6th Cir.1975).
 
 
 47
 Plaintiffs' final claim on this point is that they have not had a full and fair opportunity to litigate the unitary finding. The Beckett plaintiff class represented black school students in the Norfolk school system. It litigated for almost twenty years. Norfolk's black school children are the plaintiffs here. While the actual makeup of class members may be different because of the passage of time (as it is bound to have been at the beginning and ending of Beckett ), we believe that the two classes are in sufficient privity for the principles of collateral estoppel or issue preclusion to apply. Bell v. Board of Educ. Akron Public Schools, 683 F.2d 963 (6th Cir.1982); Bronson, supra, 525 F.2d at 349. The Beckett plaintiffs had a full and fair opportunity to contest the district court's 1975 unitary finding. These plaintiffs cannot now relitigate that issue here. Los Angeles Branch NAACP, supra; Bronson, supra; see Azalea Drive-In Theatre, Inc. v. Hanft, 540 F.2d 713 (4th Cir.1976), cert. den. 430 U.S. 941 (1977).
 
 
 48
 Mindful of the Court's admonition in Montana, 440 U.S. p. 163, 99 S.Ct. p. 978, that "[un]reflective invocation of collateral estoppel against parties with an ongoing interest in constitutional issues could freeze doctrine in areas of the law when responsiveness to changing patterns of conduct or social mores is critical," we nevertheless conclude that the district court did not err in finding that its 1975 order was binding upon these parties.
 
 VI. Norfolk as a Unitary School System
 
 49
 The question of whether the Norfolk school system was unitary at the time of the trial was explored at trial, perhaps with the intent to show that the school system was not unitary in 1983 and 1984 although it might have been in 1975.
 
 
 50
 In Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), the Court for the first time spoke of the goal of school desegregation as the transition of a dual school system into a unitary one. The Green plaintiffs brought suit challenging the freedom of choice plan initiated in New Kent County, Virginia.[12] New Kent County is a rural county in eastern Virginia. Its school system consisted of two schools, a white school serving grades 1-12 and a black school serving the same grades. School segregation had existed, of course, in all parts of Virginia prior to Brown I, under both constitutional and statutory command. When the Green complaint was filed, pupil assignment in the county was governed by a pupil placement board created by state law. Green at 391 U.S. 432-3, 88 S.Ct. at 1691. Students were generally reassigned each school year to the school they had attended the prior year unless they sought reassignment by the placement board. After the Green suit was filed, the school board adopted a freedom of choice plan to desegregate their two schools.
 
 
 51
 In finding the freedom of choice plan constitutionally inadequate as a remedy under the facts of that case, the Court first concluded that the county had established and operated a school system under state law like that forbidden by Brown --a "dual system, part 'white' and part 'Negro'." Green, supra, 391 U.S. at 435, 88 S.Ct. at 1692. Additionally, the county had delayed the dismantling of that dual system, and the freedom of choice plan had induced only 15% of Negro students to attend the formerly all white school. No white student had attended the all Negro school. Within that factual setting, the freedom of choice plan did not provide any meaningful assurance that the dual system would be promptly dismantled. The facts showed otherwise because, after three years of operation under the freedom of choice plan, 85% of the county's black students still attended all black schools.
 
 
 52
 Under the mandate of Brown "[s]chool boards ... then operating state-compelled dual systems were ... clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." Green, supra, 391 U.S. at 437-8, 88 S.Ct. at 1693-94. All aspects of public education must be freed from the vestiges of state sanctioned racial segregation before a school system becomes unitary. Integration must occur in the system's faculty, staff, transportation practices, extracurricular activities, facilities and pupil assignment. Green, supra, 391 U.S. at 435, 88 S.Ct. at 1692-93.
 
 
 53
 As we have previously stated, the mere implementation of a desegregation plan does not convert a dual system into a unitary one. United States v. Texas Ed. Agency, supra, 647 F.2d at 508.
 
 
 54
 The district court here found that its 1975 finding that the Norfolk school system had achieved a unitary status was a correct one and that the school system retained its unitary status until the present. It found that "the Norfolk School Board is an integrated body, the Norfolk school administration is racially balanced, the racial composition of the faculty and staff is mixed, and the overwhelming majority of school children, of both races, on the elementary, junior and senior high school levels, attend schools whose student bodies are racially mixed. In addition, there has been no contention, nor could there be one, that the extracurricular activities, transportation network and school facilities are operated in a dual fashion. Finally ... there has been no challenge to any of the Board's actions in the Beckett litigation since some time before the 1975 order was entered."
 
 
 55
 Our review of the district court's finding that the school system is unitary is under Fed.R.Civ.Pro. 52(a)'s requirement that findings of fact be set aside only if clearly erroneous. Vaughns v. Board of Education of Prince George's Co., 758 F.2d 983 (4th Cir.1985). Factual findings by a district court in school desegregation cases, especially where the presiding judicial officer has lived with the case for many years, are entitled to great deference on review. Vaughns, supra, at 990; see Goldsboro City Board of Education v. Wayne Co. Board of Education, 745 F.2d 324, 327 (4th Cir.1984); Columbus Board of Education v. Penick, 443 U.S. 449, 457 n. 6, 99 S.Ct. 2941, 2946 n. 6, 61 L.Ed.2d 666 (1979).
 
 
 56
 Under the clearly erroneous standard, a reviewing court may not reverse the findings of the trial court simply because it would have decided the case differently. "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer City, N.C., --- U.S. ----, ----, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). This rule applies even when the district court's findings rest upon physical or documentary evidence. We are cautioned that our appellate role is violated if we seek to decide the matter anew.
 
 
 57
 We cannot say that the trial court's finding that the school system is unitary is clearly erroneous. The evidence in the record supports the court's conclusion that the faculty and staff are fully integrated. Three of the seven board members are black. The superintendent and two of the three regional assistant superintendents are black. No serious question is raised that the faculty and staff are still segregated, and we agree that no such segregation exists.
 
 
 58
 The district court found that the overwhelming majority of Norfolk's students attend racially mixed schools. The statistics in the record bear out that conclusion. As a general rule, the school board has been able to keep its elementary schools within the 70%-30% guideline adopted in the early 1970's.[13] We agree with the district court's finding that Norfolk's students are attending integrated schools. No one argues that the school facilities, extracurricular activities or transportation system are operated in a dual manner. We note again that the busing of students continues in grades 7-12.
 
 
 59
 The district court reviewed all six factors set out in Green and found that Norfolk's school system had remained unitary since 1975. There is substantial evidence in the record to support such a finding. We therefore affirm its holding.
 
 VII. Effect of the Unitary Finding
 
 60
 This brings us to the principal issue in this appeal: What effect does the finding that Norfolk's school system is unitary have upon the prosecution of a constitutional challenge to the proposed neighborhood school assignment plan? What procedure governs a challenge to a student assignment plan for a school district that historically practiced de jure segregation but had obtained a valid judicial order that it has ridded itself of all vestiges of that racial discrimination? A related inquiry must be to what extent and for how long must a previously discriminating school system submit to judicial control. Does judicial involvement end when unitary status is achieved or does judicial involvement continue in perpetuity to prevent resegregation absent a showing of intent to discriminate?[14]
 
 
 61
 The district court concluded that its finding that the Norfolk school system is unitary had the effect of shifting the burden of proof from the defendant school board to the plaintiffs. It held that plaintiffs had the burden of proving that the school board implemented the contested pupil assignment plan with an intent to discriminate on the basis of race.
 
 
 62
 Plaintiffs disagree with the allocation of the burden of proof by the district court. They claim that the burden of proof remains on the school board to prove that implementation of the new assignment plan will not perpetuate the vestiges of the past de jure dual system. While we find no case which has addressed the issue under a fact situation the same as present here, we agree with the district court's allocation of the burden of proof.
 
 
 63
 Since 1954, de jure racial segregation in public schools has been unlawful as in violation of the Fourteenth Amendment to the Constitution. Brown, supra. Such discriminating schools were placed under an "affirmative duty to 'effectuate a transition to a racially non-discriminatory school system'." Keyes v. School Dist. No. 1, Denver, Col., 413 U.S. 189, 200, 93 S.Ct. 2686, 2693, 37 L.Ed.2d 548 (1973), quoting Brown v. Board of Education, 349 U.S. 294, 301, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955) (Brown II). State sanctioned dual school systems must take whatever steps are necessary to completely eliminate racial discrimination. Dayton Board of Ed. v. Brinkman, 443 U.S. 526, 537-8, 99 S.Ct. 2971, 2979, 61 l.Ed.2d 720 (1979) (Dayton II); Columbus Bd. of Ed. v. Penick, 443 U.S. 449, 458-59, 99 S.Ct. 2941, 2946-47, 61 L.Ed.2d 666 (1979); Swann, supra, 402 U.S. at 15, 91 S.Ct. at 1275; Green, supra, 391 U.S. at 437-8, 88 S.Ct. at 1693-94. Each instance of a refusal or failure to perform its duty to desegregate constitutes a constitutional violation by the school board. Columbus Bd. of Ed., supra, 443 U.S. at 459, 99 S.Ct. at 2947, citing other cases.
 
 
 64
 Once a plaintiff shows that segregation exists in a school system that was authorized or required by state law at the time Brown was decided, it follows as a matter of course that the school authorities have a duty to eliminate such segregation. Keyes, supra, 413 U.S. at 200-3, 93 S.Ct. at 2693-95. The board cannot satisfy its duty by merely abandoning its prior discriminatory purpose. Nor can it take any action that would impede the process of converting to a unitary system. Dayton II, supra, 443 U.S. at 538, 99 S.Ct. at 2979. The board is under a heavy burden of showing that any action it takes that continues the effects of the illegal dual system serves a legitimate end. Id. The burden remains upon the school board to dismantle the segregated system and convert to a "unitary system in which racial discrimination [is] eliminated root and branch." Green, supra, 391 U.S. at 438, 88 S.Ct. at 1694.
 
 
 65
 Rescission of a voluntary desegregation plan itself may be found to be an act of segregation for a school board which has been found to have practiced de jure segregation and has not completed the transition from a dual to a unitary school system. NAACP v. Lansing Bd. of Ed., 559 F.2d 1042 (6th Cir.), cert. den. 434 U.S. 997, 98 S.Ct. 635, 54 L.Ed.2d 491 (1977). In a school system that has not become unitary, the school board is not barred from ever changing a desegregation plan. In such a situation, however, the board must show that the proposed changes are consistent with its continuing affirmative duty to eliminate discrimination. Clark v. Board of Educ. of Little Rock School Dist., 705 F.2d 265 (8th Cir.1983).
 
 
 66
 The continued existence of a small number of one race schools within such a school district does not establish in and of itself a constitutional violation. Swann, supra, 402 U.S. at 26, 91 S.Ct. at 1281; Clark, supra, 705 F.2d at 272. The burden is upon the school board, however, to show that the existence of such schools are genuinely nondiscriminatory and not vestiges of past segregation. Swann, supra, 402 U.S. at 26, 91 S.Ct. at 1281; Davis v. E. Baton Rouge Parish School Bd., 721 F.2d 1425, 1434 (5th Cir.1983).
 
 
 67
 A district court is under a duty to enter a desegregation order that will go as far as possible toward eliminating segregation. Green, supra, 391 U.S. at 438 n. 4, 88 S.Ct. at 1694 n. 4. The court's equitable powers in such decrees are broad indeed, but they are not plenary. They are limited to those cases in which a constitutional violation has occurred, either where a de jure segregated system exists, where intent to discriminate is presumed, or where a de facto segregated system exists and intent to discriminate has been proven. In situations in which a school board has defaulted on its obligations, the court can use its broad powers to fashion a remedy in order to assure a unitary system. Swann, supra, 402 U.S. at 16, 91 S.Ct. at 1276.
 
 
 68
 Once such a remedy is fashioned, the district court retains jurisdiction until it is clear that the unlawful segregation has been completely eliminated. But once the goal of a unitary school system is achieved, the district court's role ends. See, generally, Pasadena City Bd. of Ed. v. Spangler, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976). Foreseeing such a time, the Swann Court stated:
 
 
 69
 At some point, these school authorities and others like them should have achieved full compliance with this Court's decision in Brown I. The systems would then be 'unitary' in the sense required by our decisions in Green and Alexander.
 
 
 70
 It does not follow that the communities served by such systems will remain demographically stable, for in a growing, mobile society, few will do so. Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system. This does not mean that federal courts are without power to deal with future problems; but in the absence of a showing that either the school authorities or some other agency of the State has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools, further intervention by a district court should not be necessary.
 
 
 71
 Swann, supra, 402 U.S. at 31-32, 91 S.Ct. at 1283-84.
 
 
 72
 In Pasadena, supra, 427 U.S. 424, 96 S.Ct. 2699, the Court again recognized that the right of the federal courts must end when the objective sought has been achieved. A court ordered desegregation plan was adopted in 1970 which provided that students must be assigned in such a manner so that no school in the district would be comprised of "a majority of any minority students." Id. at 428, 96 S.Ct. at 2701. The district court retained jurisdiction in the case. Neither party appealed, and the plan became effective that same calendar year.
 
 
 73
 Four years later, the school board returned to court, seeking, among other things, relief from the no "majority of any minority students" provision in the form of a lifting of the court's injunction. The district court refused to grant the school board relief from its order primarily because it perceived that the school board had not properly complied with its order after the first year it was in force. The school board had adjusted attendance zones in 1970 to comply with the order but had not readjusted each year thereafter. As a result, schools slipped out of literal compliance with the not to exceed 50% mandate by the next school year. By the time of the district court hearing, five of the system's 32 schools no longer met the less than 50% rule. Id. at 431, 96 S.Ct. at 2702. The district court made clear that it expected the school board to readjust student attendance figures yearly to comply with the court's ruling. Id. at 433, 96 S.Ct. at 2703. The court of appeals found that the district court had not abused its discretion in imposing such an annual requirement.
 
 
 74
 The Supreme Court disagreed. Initially, it found that the district court was impermissibly requiring a "particular degree of racial balance or mixing" which Swann expressly condemned. Id. at 434, 96 S.Ct. at 2703-04. While such a racial balance can be a starting point on the road to complete desegregation, it reasoned, it can never be an inflexible requirement.
 
 
 75
 Next, the Court rejected the district court's authority to impose such a requirement absent a showing that the defendant school board was responsible for the intervening changes in the racial composition of the schools. The Court relied approvingly on the cautionary language of Swann that " 'it must be recognized that there are limits' beyond which a court may not go in seeking to dismantle a dual school system. [Citation omitted] These limits are in part tied to the necessity of establishing that school authorities have in some manner caused unconstitutional segregation, for '[a]bsent a constitutional violation there would be no basis for judicially ordering assignment of students on a racial basis'." Id. at 434, 96 S.Ct. at 2703-04.
 
 
 76
 The district court had found a constitutional violation in 1970 and thus had the initial authority to cause the reassignment of students on the basis of race. But once Pasadena adopted a racially neutral system, no further constitutional violation could be found unless by acts attributable to the school board. At that point, the district court exceeded its authority by requiring the readjustment of attendance zones absent such a constitutional violation. Because the school board was not responsible for the demographic shifts in the population which caused the schools to slip out of compliance, it was under no duty to adjust school attendance figures to reflect those changes. The Court concluded that "having once implemented a racially neutral attendance pattern in order to remedy the perceived constitutional violations on the part of the defendants, the District Court had fully performed its function of providing the appropriate remedy for previous racially discriminatory attendance zones." Id. at 436-7, 96 S.Ct. at 2704-05.
 
 
 77
 We have only recently examined both Pasadena and Swann and concluded that a district court's power to effect additional remedial orders is limited. "Once a school system has achieved unitary status, a court may not order further relief to counter-act resegregation that does not result from the school system's intentionally discriminatory acts." Vaughns, supra, at 988. Other courts have reached the same conclusion. Davis, supra, 721 F.2d at 1435 ("Changes in neighborhood ethnicity taking place after school officials have transformed their system into a unitary one need not be remedied, of course, for school officials are under no duty to adjust for the purely private acts of those who chose to vote with their feet."); Ross v. Houston Independent School Dist., 699 F.2d 218, 225 (5th Cir.1983) ("When state officials have not only made good faith efforts to eliminate the vestiges of segregation, but have actually achieved a school system clean of every residue of past official discrimination, immutable geographic factors and post-demographic changes that prevent the homogenation of all student bodies do not bar judicial recognition that the school system is unitary.") But see United States v. Hendry Co. Sch. Dist., 504 F.2d 550, 554 (5th Cir.1974) ("We cannot tolerate resegregation of a former dual school system, and the school board of such a system must demonstrate that the new construction will not tend to promote such a relapse." The decision was prior to Pasadena, however.)
 
 
 78
 We agree with the district court that Swann and the cases that follow, both in the Supreme Court and in the courts of appeals, require a plaintiff to prove discriminatory intent on the part of the school board of a unitary school system.
 
 
 79
 We think the rationale of these cases is applicable here. We recognize some factual differences between those cases, where factors outside the school board's control such as demographic changes cause the racial composition of schools to change, and the case we consider today, where an act of the school board in changing a part of a desegregation plan results in the shifting racial composition of the schools. We do not take lightly this factual distinction but conclude that the plaintiffs must be required to carry the burden of proving discriminatory intent.
 
 
 80
 While we find no case decided in the same situation as that before us, the Ninth Circuit has alluded to markedly similar facts in holding that the district court must relinquish jurisdiction over the Pasadena case following remand. Spangler v. Pasadena, 611 F.2d 1239 (9th Cir.1979). Following the Supreme Court decision in Pasadena, the school board sought to have the district court dissolve the injunction entered in the case and relinquish jurisdiction.[15] The district court refused to end its oversight over the Pasadena school system.
 
 
 81
 The court of appeals concluded that the district court's refusal was based upon a belief that "unless it retained jurisdiction, the Board might at some future date, by action or inaction, cause or suffer to occur some degree of avoidable 'resegregation'." Spangler, supra, at 1240.[16] In reversing that decision, the Ninth Circuit relied upon the three factors set out in Millikin v. Bradley, 433 U.S. 267, 280-1, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977) (Millikin II), in ascertaining the propriety of the remedial measures to be used following a finding of de jure school segregation. First, the court must consider the nature and scope of the constitutional violation; second, the remedial objective sought is to be the restoration of the victims of discrimination to the position they would have occupied absent the constitutional violation; and, third, consideration must be given to the interests of allowing state and local authorities to manage their own affairs. Finding all three factors were met following nine years of court supervision, the Ninth Circuit concluded that the time had come to end court intervention in Pasadena's school system. 611 F.2d at 1240-1241 (Judge Goodwin).
 
 
 82
 Judge Kennedy's opinion set out in more detail the basis for the district court's concerns over resegregation. The district court feared that once jurisdiction terminated, the school board planned to return to a neighborhood school plan as had existed before the 1970 court ordered desegregation plan. If the neighborhood plan were readopted, the racial composition of Pasadena's schools would revert to approximately what it was before the desegregation plan. Spangler, supra, at 1243. School board members had made it known publicly that they endorsed return to a neighborhood school plan. It was upon these facts that the district court based its finding of continuing intentional discrimination by the school board. Spangler, supra, at 1244.
 
 
 83
 The court found (Judge Kennedy) that the district court had committed errors of law in reaching that conclusion. Initially, the district court appeared to be requiring a certain racial balance to be maintained in Pasadena's schools, a concept disapproved by the Supreme Court. It said "[t]he Supreme Court has emphasized that when a large percentage of minority students in a neighborhood school results from housing patterns for which school authorities are not responsible, the school board may not be charged with unconstitutional discrimination if a racially neutral assignment method is adopted.... From the standpoint of racial balance in pupil assignments, compliance with the [court's desegregation plan] for nine years is sufficient in this case, given the nature and degree of the initial violation, to cure the effects of previous improper assignment policies." Spangler, supra, at 1244.
 
 
 84
 It rejected the district court's justification that continuing jurisdiction was required to prevent readoption of a neighborhood school plan with its concomitant change in racial balance, and found that adoption of a neighborhood plan was not necessarily synonymous with an intent to discriminate. "Adopting a student assignment method different from the [court's plan] may have the foreseeable effect of increasing racial imbalance in the Pasadena schools. This fact is relevant in determining whether a plan was adopted as a result of invidious intent, but other factors must also be examined.... The fact that the Board has explored assignment alternatives which may increase racial imbalance provides little support for the conclusion ... that the proposal, if adopted, would result from constitutionally infirm motives." Spangler, supra, at 1245.
 
 
 85
 Both opinions agreed that if a new student assignment plan were adopted in Pasadena with the intent to discriminate, a new suit could be brought to challenge such a plan. In the absence of such intentional acts, authority to run the school system should be returned to the school board. Spangler, 611 F.2d at 1241, 1242, 1247.
 
 
 86
 The 1975 order of the district court in Norfolk returned control of the city's schools to the school board by its finding that the school system was unitary. Nothing in the record about events between then and the proposal of the pupil assignment plan here in question has changed that situation. The Norfolk board recently took the very action the court considered to be contemplated by the Pasadena school board. While the Ninth Circuit had only the question of termination of district court jurisdiction before it, that court made clear that following such relinquishment, a plaintiff must prove that the school board acted with an intent to discriminate in adopting a new student assignment plan. We find that reasoning persuasive and consistent with our reasoning in Vaughns. We hold that the burden of proving discriminatory intent attaches to a plaintiff once a de jure segregated school system has been found to be unitary.
 
 
 87
 Once a constitutional violation has been remedied, any further judicial action regarding student assignments without a new showing of discriminatory intent would amount to the setting of racial quotas, which have been consistently condemned by the Court in the context of school integration absent a need to remedy an unlawful condition. Pasadena, supra, 427 U.S. at 433-4, 96 S.Ct. at 2703; Millikin v. Bradley, 418 U.S. 717, 740-41, 94 S.Ct. 3112, 3125, 41 L.Ed.2d 1069 (1974) (Millikin I ); Swann, supra, 402 U.S. at 24-5, 91 S.Ct. at 1280. Racial quotas are to be used as a starting point in remedying de jure segregation but not as an ultimate goal to be continued in perpetuity. Indeed, since almost every action of a school board with respect to pupil assignments in a mixed school system necessarily affects racial balance, if we were to require the Norfolk school board to justify every action it takes that affects the racial balance of its schools, we would make a finding that the school system is unitary virtually meaningless in that context. The 1975 unitary finding marks the end of de jure segregation in the system. Following such a finding, control of the system must be allowed to return to local officials. No one seriously disputes that public education has traditionally been a local concern. Generally, Millikin I, supra, 418 U.S. at 741-2, 94 S.Ct. at 3125-26. And the power of the federal courts is not plenary, Swann, 402 U.S. p. 16, 91 S.Ct. p. 1976; rather, it depends upon a constitutional violation for its exercise. Pasadena, 427 U.S. p. 434, 96 S.Ct. p. 2703.
 
 
 88
 We reject plaintiffs' argument that the Norfolk school board must continue to justify all of its actions because of the history of segregation. While that history of discrimination cannot and should not be ignored, it "cannot in the manner of original sin, condemn governmental action that is not itself unlawful." City of Mobile v. Bolden, 446 U.S. 55, 74, 100 S.Ct. 1490, 1503, 64 L.Ed.2d 47 (1980) (plurality opinion of the Court by Justice Stewart). If the rule were otherwise, virtually every action of the school board with respect to any of its various affairs would be suspect. And, to repeat, we keep in mind that while the history of discrimination is not dispositive, it is relevant to a court's determination of the school board's intent.
 
 
 89
 Plaintiffs' reliance on cases such as Columbus Board of Education, supra, 443 U.S. 449, 99 S.Ct. 2941; Dayton Board of Education v. Brinkman, 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979) (Dayton II ); Keyes, supra, 413 U.S. 189, 93 S.Ct. 2686; Swann, supra, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554, and Green, supra, 391 U.S. 430, 88 S.Ct. at 1690 for placing the burden of proof on the school board is misplaced because all of those cases involved state sanctioned discriminating school districts that had not dismantled their dual systems. None had reached the goal of a unitary system as Norfolk has done.
 
 VIII. Plaintiffs' Proof
 
 90
 We next consider whether or not plaintiffs met their burden of proof. Plaintiffs raise errors both of law and fact in the district court's decision making process. Initially, they claim the district court erred in its approval of the school board's consideration of white flight as one reason for abandonment of busing of elementary school children. We agree with plaintiffs that white flight cannot be used as a justification for failing or refusing to dismantle a dual school system. United States v. Scotland Neck Board of Education, supra, 407 U.S. at 491, 92 S.Ct. at 2218; Monroe v. Board of Commissioners, 391 U.S. 450, 459, 88 S.Ct. 1700, 1705, 20 L.Ed.2d 733 (1972). White flight cannot be used as an excuse to resist or evade a present duty to desegregate. But the Norfolk school board is not operating a dual school system with a present duty to desegregate.
 
 
 91
 Consideration can be given to the phenomenon of white flight under certain circumstances. As the Sixth Circuit said in a much quoted opinion "[i]t does not follow that a board must ignore the probability of white flight in attempting to formulate a voluntary plan which would improve the racial balance in the schools without at the same time losing the support and acceptance of the public.... [T]here is a valid distinction between using the defense of white flight as a smokescreen to avoid integration and realistically considering and dealing with the practical problems involved in making voluntary efforts to achieve integration." Higgins, supra, 508 F.2d at 794 (emphasis in the original). The circuits have consistently followed this language and allowed consideration of white flight in the formulation and adoption of integration plans. Lee v. Anniston City School System, 737 F.2d 952, 957 n. 3 (11th Cir.1984); Liddell v. State of Mo., 731 F.2d 1294, 1314 (8th Cir.1984), cert. den. --- U.S. ----, 105 S.Ct. 82, 83 L.Ed.2d 30; Johnson v. Bd. of Education of City of Chicago, 604 F.2d 504, 516-517 (7th Cir.1979), vacated on other grounds, 449 U.S. 915, 101 S.Ct. 339, 66 L.Ed.2d 162 (1980); Parents Assn. of Andrew Jackson High School v. Ambach, 598 F.2d 705, 719-20 (2d Cir.1979); Stout v. Jefferson Co. Bd. of Ed., 537 F.2d 800, 802 (5th Cir.1976).
 
 
 92
 We are of opinion the district court correctly concluded that the school board could legitimately consider the presence of white flight in the pursuit of a voluntary plan to stabilize school integration in Norfolk. We reject plaintiffs' argument that under Regents of the University of California v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), the neighborhood school plan is suspect because its assignments are based upon race. School assignments are based upon the residence of the child, not the race of the child. Plaintiffs present no evidence to support a finding that such a residential classification is a pretext for discrimination based on race. The board assigned students to schools under the new plan solely on the basis of their residence. The only consideration of race involved was an effort on the board's part to gerrymander the school assignment lines to result in the maximum amount of integration possible.
 
 
 93
 The concept of a neighborhood school system in and of itself is not violative of the Constitution. E.g. Crawford v. Los Angeles Board of Education, 458 U.S. 527, 537 n. 15, 102 S.Ct. 3211, 3217-18 n. 15, 73 L.Ed.2d 948; Swann, supra, 402 U.S. at 28, 91 S.Ct. at 1282; Thompson v. Sch. Bd. of City of Newport News, Va., 465 F.2d 83 (4th Cir.1972). Congress has recognized that absent discrimination the neighborhood school is the appropriate basis for school assignments. 20 U.S.C. Sec. 1701. Without more, we find nothing constitutionally suspect in the board's preference for a neighborhood school plan.
 
 
 94
 Whether white flight was present in Norfolk during the relevant times is of course a question of fact. The district court concluded that the evidence revealed a significant amount of white flight from Norfolk's public schools. It found that the system lost 6000-8000 white students because of busing. It further found that because of this exodus of white students, the school system was becoming more and more black and faced the real danger of resegregation. As set forth in Part VI, supra, our review of such factual findings is limited by the clearly erroneous rule. We conclude that there are sufficient facts in the record to support the district court's finding that white students are leaving the public schools because of busing. The school attendance figures show that white students have gone from a 60% majority to a 42% minority during the decade of the 1970's. By 1982, whites comprised only 40.87% of the total school enrollment.[17] During this same time frame, white residents continued to be a majority of the city, falling from 70% to 60%. Clearly, white students are leaving Norfolk's public schools at a much higher rate than they are leaving the city itself.
 
 
 95
 In addition to students who attend private schools, Norfolk's public schools were losing those students whose families would otherwise move into the city but who chose to move elsewhere to avoid busing. In 1981, for example, Virginia Beach (273,600) and adjoining Norfolk (273,000) were almost the same size but the school system in Virginia Beach (54,776) was more than half again larger than that of Norfolk (35,816). This supports the district court's finding that a disproportionate number of white families are choosing to move to Virginia Beach.
 
 
 96
 Dr. Gene Carter, superintendent of the Norfolk school system, testified that students had left the city's public schools because of the mandatory busing plan. Former superintendent, Dr. Albert Ayars, an opponent of the neighborhood plan, nevertheless recognized that some students were leaving the system because of busing.
 
 
 97
 Plaintiffs argue that the district court's findings are clearly erroneous because their school enrollment figures show that white enrollment in the public schools had stabilized during the early 1980's. These figures set out below[18] reveal that black students comprised 42.4% of the student population in 1969. That percentage consistently increased until 1981 when blacks represented 59.2% of the students. In 1982, the black percentage dropped to 58.8% and to 58% the following year. Plaintiffs rely upon this slight increase in white student enrollment over two years to show that white flight, if ever present, had ended. There is evidence in the record to show that this overall increase in enrollment since 1980 is an aberration due to housing patterns of the Navy during this time. Even absent such an explanation, plaintiffs' enrollment figure differences are not sufficient for us to find that the district court was clearly erroneous. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson, supra, --- U.S. at ----, 105 S.Ct. at 1512.
 
 
 98
 It is also claimed that the board's reliance upon a decrease in parental involvement under the busing plan is merely a pretext for discriminating on the basis of race. As we have previously noted, one of the board's concerns in amending its busing plan was the dramatic drop in parental involvement. No one disputes that such involvement is critical to the well-being of a school system. Former Superintendent Ayars testified that according to a Gallup poll parental involvement was characterized as the "most significant factor in the education of a child." Dr. Ayars himself considered parental involvement "vital" to the health of a school system.
 
 
 99
 The district court found that Norfolk's public schools were facing a crisis because of the sharp decline in parental involvement. PTA enrollment had dropped from 15,000-20,000 to 3500. Dr. Ayars testified that busing "virtually destroyed" Norfolk's PTA. Efforts to increase parental involvement had been somewhat successful but much more needed to be done to encourage parental interest.
 
 
 100
 Superintendent Carter testified that many parents had approached him regarding their inability to participate in their children's education under the busing plan. School board members also expressed concern over the lack of parental involvement in the public schools. The district court found that Norfolk's public schools faced a crisis because of the sharp decline in parental involvement during the years of busing and that the new plan offered a reasonable alternative to counter such a decline. We agree. The Norfolk school board was faced with the difficult task of bringing parents back into the school system. These parents stopped participating during the time their children attended schools across town. For many, a lack of transportation to those distant schools could have served as a stumbling block to their participation. For others, the extra time and expense required to drive across town may have prevented their participation. For still others, the feeling of a lack of community with a cross-town school may have been a factor. Returning these children to schools close to their homes represented a reasonable attempt to once again obtain the involvement of their parents in the school system.
 
 
 101
 Plaintiffs contend that the district court's findings regarding parental involvement are clearly erroneous because prior attempts by the school board had been successful in obtaining the return of parents to the schools. Former Superintendent Ayars did testify that a past effort had succeeded in obtaining many parents to volunteer to assist in planning school programs. Dr. Ayars admitted, however, that much more needed to be done to increase the number of parents involved at the elementary school level. Plaintiffs also contend that PTA enrollment figures are an inappropriate method of measuring parental involvement. They offer no alternative method, however. We know of no better gauge of parental interest in a school system than involvement in its PTA program. We find substantial evidence in the record to support the district court's conclusion that the school board's concern over parental involvement was not a pretext for racial discrimination.
 
 
 102
 Plaintiffs also argue that discriminatory intent can be seen in the board's failure to follow normal procedures in adoption of the proposed plan. These improper procedures include raising the busing issue at a board meeting where such a topic was not on the agenda and when busing's leading proponent, Dr. John Foster, was absent. Plaintiffs also fault the board for failure to solicit the opinions of Dr. Ayars and for failing to investigate the psychological impact of such a neighborhood plan on black children.
 
 
 103
 The district court properly found that the decision making procedure followed by the board was reasonable and not indicative of discriminatory intent. The actions taken by the board show nothing short of a reasonable, deliberative process where the citizens of Norfolk were encouraged to speak up and express their views. The board's adoption of the neighborhood plan was not the result of a single meeting behind closed doors. Instead, the board first established a committee to investigate the issue. That committee appointed a task force to obtain data on the subject. The committee visited several school systems to study their plans. The board solicited the opinions of several experts in the field and retained Dr. Armor for more extensive findings. Six public meetings were held to elicit public comment and criticism. We know of little else the board could have done to make the procedure more fair and open.[19]
 
 
 104
 We find plaintiffs' remaining claims to be without merit. Plaintiffs fear that school resources will be inequitably distributed under the new plan so that schools with predominantly white students will receive more than their fair share of both material and human resources. As we have pointed out, the school administration is completely integrated. The superintendent and two of the three regional assistant superintendents are black. Blacks comprise 41% of the system's principals and 44% of its teachers. We conclude that plaintiffs' fears are not enough to prove a claim such as this when the decision-makers in the system are themselves integrated. We are additionally reminded that the plan itself provides for judicial review of resource allocation.
 
 
 105
 Plaintiffs infer discriminatory intent from the board's failure to provide for an alternative plan should the neighborhood plan be unsuccessful at stopping the exodus of white students. We agree with the district court that such a failure would not have an appreciably different effect than continuation of the busing plan under present trends. In either case, the school system would become predominantly black.
 
 
 106
 We find no evidence in the record to support the plaintiffs' contention that the school board and the housing authority have acted in concert with the intent to discriminate on the basis of race. As the district court pointed out, Norfolk's housing projects were constructed as a general rule to replace slum areas in the city. Those residents displaced by that demolition were given priority in assignment to the new housing projects. No one disagrees that most of those residents were black, and blacks still represent the vast majority of housing project tenants in Norfolk. This record shows no evidence by either the housing authority or the school board to assign such housing by race following the culmination of the Beckett case.[20]
 
 
 107
 We think the district court was correct in its holding that the discriminatory impact alone shown here is not sufficient to make out such a claim. Arlington Heights, supra, 429 U.S. at 266, 97 S.Ct. at 564; Washington, supra, 426 U.S. at 242, 96 S.Ct. at 2049. Such impact is clearly relevant to a determination of intent, however. Columbus Bd. of Ed., supra, 443 U.S. at 464, 99 S.Ct. at 2950; Dayton II, supra, 443 U.S. at 536 n. 9, 99 S.Ct. at 2978 n. 9; Washington, supra, 426 U.S. at 242, 96 S.Ct. at 2049. In a school desegregation case in which intent is not presumed, a plaintiff must show a discriminatory purpose on the part of the defendant in order to make out a constitutional violation. This purpose, or intent to discriminate, marks the difference between de facto and de jure segregation. The finding that a school population is not homogenous, standing by itself, does not, absent intent, indicate a constitutional violation. Dayton Bd. of Ed. v. Brinkman, 433 U.S. 406, 413, 97 S.Ct. 2766, 2772, 53 L.Ed.2d 851 (1973) (Dayton I ) Swann, supra, 402 U.S. at 17-18, 91 S.Ct. at 1276-77. Hence, the presence of one-race schools within a community, standing alone, is not a violation of the Constitution. See Washington, supra, 426 U.S. at 240, 96 S.Ct. at 2047; Swann, supra, 402 U.S. at 26, 91 S.Ct. at 1281.
 
 
 108
 We agree with the district court that the evidence reveals that Norfolk's neighborhood school assignment plan is a reasonable attempt by the school board to keep as many white students in public education as possible and so achieve a stably integrated school system. It also represents an attempt to improve the quality of the school system by seeking a program to gain greater parental involvement. While the effect of the plan in creating several black schools is disquieting, that fact alone is not sufficient to prove discriminatory intent. While the number of substantially all black schools in the system will not be decreased by the minority to majority option, the number of students attending such schools will be significantly decreased.
 
 
 109
 Our holding is a limited one, applicable only to those school systems which have succeeded in eradicating all vestiges of de jure segregation. In those systems, the school boards and not the federal courts will run the schools, absent a showing of an intent to discriminate. We do not think this is a case in which a school board, upon obtaining a judicial decision that it is unitary, turns its back on the rights of its minority students and reverts to its old discriminating ways. If such were the case, we would, of course, not approve Norfolk's new assignment plan. But such is not the case. The school board of Norfolk has done a reasonable job in seeking to keep its schools integrated in the face of a massive exodus of white students. We should not tie its hands and refuse to allow it to try another plan that may be successful in stopping that exodus.
 
 
 110
 The district court has thoughtfully and carefully considered the complex issues before it, and its judgment is accordingly
 
 
 111
 AFFIRMED.
 
 
 
 [1]
 Secondary schools are not affected by the plan. Busing is continued for them
 
 
 [2]
 Its members included Dr. Jane Carter, Dr. John McLaulin, and Dr. Aaron Gay
 
 
 [3]
 An alternate plan, Plan II, was also presented at these hearings. That plan provided for changing but not eliminating busing but did not meet with public support
 
 
 [4]
 Those school board members in favor of the new plan included Thomas Johnson (white), Jean Bruce (white), Cynthia Heide (white), Mrs. Hortense Wells (black), and Robert Hicks (white). Those opposed were Rev. John Foster (black) and Dr. Lucy Wilson (black)
 
 
 [5]
 Of thirty-seven elementary schools at the time of trial, there were twenty-two elementary schools attended by students that were bused. One of those, Ghent Elementary School, offered an open classroom program and accepted students from anywhere in the city. The remaining fourteen schools were single attendance zone schools whose students were not bused
 
 
 [6]
 Plaintiffs do not challenge the method by which the zones were drawn, or the zones themselves, but instead challenge the plan as a whole
 
 
 [7]
 
 Projected % %
School Assignment White Minority
--------------------- ------------ ------------ ------------
Bay View 710 84 16
Bowling Pk. 589 1 99
Calcott 563 61 39
Camp Allen 689 62 38
Chesterfield 572 1 99
Coleman Place 970 47 53
Crossroads 714 37 63
Diggs Pk. 381 2 98
Fairlawn 282 73 27
Granby El. 674 44 56
Ingleside 665 38 62
Jacox 769 1 99
Larchmont 685 52 48
Larrymore 768 31 69
Lindenwood 492 21 79
Little Cr. El. & Pri. 1037 75 25
Meadowbrook 512 61 39
Monroe 831 0 100
Norview 602 32 68
Oakwood 415 35 65
Oceanair 672 71 29
Oceanview 586 78 22
Poplar Halls 388 43 57
Roberts Pk. 401 0 100
St. Helena 355 2 98
Sewells Pt. 664 64 36
Sherwood For. 627 70 30
Suburban Pk. 539 55 45
Tarrallton 548 48 52
Taylor 487 54 46
Tidewater Pk. 276 2 98
Tucker 312 3 97
Willard 802 26 74
Willoughby 558 65 35
Young Pk. 510 1 99
Ghent 600 (open classroom program)
 
 
 [8]
 Students were lost from the public schools in two ways, those who left the schools after once being enrolled and those who settled in communities surrounding Norfolk instead of Norfolk itself
 
 
 [9]
 Twenty-five percent of Norfolk's black families live in public or subsidized housing projects. These twenty-two projects are occupied almost exclusively by black residents
 
 
 [10]
 See generally 1B Moore's Fed. Practice p .444 for a discussion of the collateral estoppel effect of consent orders
 
 
 [11]
 See 18, Wright, Miller & Cooper Federal Practice and Procedure, Sec. 4432
 
 
 [12]
 The freedom of choice plan allowed the student to choose the public school he wished to attend, with minor qualifications not pertinent here
 
 
 [13]
 Following the district court's order, the school board defined racially identifiable schools as those with fewer than 30% or more than 70% minority or non-minority students
 
 
 [14]
 We decide the case under the de facto/de jure distinction which we think is the law. See, e.g., Keyes v. School Dist. No. 1, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). One respected commentator, however, has predicted the distinction could not survive. See Bickel, Untangling the Busing Snarl, The New Republic, Sept. 23, 1972. The separate opinions of Justices Douglas and Powell in Keyes take the position that it should not
 
 
 [15]
 The district court had previously refused such a request, which refusal was affirmed on appeal. Spangler, supra, 519 F.2d 430, rev'd on other grounds, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599
 
 
 [16]
 Judges Goodwin and Kennedy delivered separate opinions. Judge Anderson concurred in the reasoning and result of both, thus both are opinions of the court
 
 
 [17]
 An agreed trial exhibit reveals the following race distributions for public school students, elementary and secondary:
 Percent
 White Black Total White**
 ------------ ------------ ------------ -----------
 1967-68 33,838 22,546 56,384 60.00
 1968-69 33,103 23,023 56,126 59.00
 1969-70 32,586 24,244 56,830 57.00
 1970-71 30,246 24,425 54,671 55.32
 1971-72 25,858 23,930 49,788 51.94
 1972-73 24,224 23,578 47,802 50.68
 1973-74 24,337 24,714 49,051 49.62
 1974-75 23,536 24,451 47,987 49.05
 1975-76 22,957 24,420 47,377 48.46
 1976-77 22,080 23,976 46,056 47.94
 1977-78 20,412 23,282 43,694 46.72
 1978-79 18,913 22,686 41,599 45.47
 1979-80 16,373 21,395 37,768 43.35
 1980-81 15,629 21,014 36,643 42.65
 1981-82 14,435 20,885 35,320 40.87
 **"Whie"--includes approximately 3% other minority races
 
 
 [18]
 
 Summary seventh day enrollment
 Norfolk Public Schools
 1969-1983
 W B T
 ----------- ----------- ----------- ----------
 1969 32603 24000 56603 42.4
 1970 30229 24418 54647 44.7
 1971 25836 23921 49757 48.1
 1972 24196 23568 47764 49.3
 1973 24304 24699 49003
 1974 23504 24442 47946 51.0
 1975 22934 24411 47345 51.6
 1976 22036 23949 45985 52.1
 1977 20365 23251 43616 53.3
 1978 18873 22658 41531 54.6
 1979 16336 21361 37697 56.7
 1980 15600 20995 36595 57.4
 1981 14427 20892 35319 59.2
 1982* 14521 20735 35256 58.8
 1983* 14611 20191 34802 58.0
 
 
 *
 1982 and 1983 figures for whites include "others."
 
 
 [19]
 Acting with the utmost caution, the board also sought judicial review of the proposed plan before implementation
 
 
 [20]
 In 1969, the district court rejected such an argument in the Beckett litigation. 302 F.Supp. 18, 27. It concluded that housing patterns resulted from de facto segregation or a desire of blacks to live with blacks and whites to live with whites. This court did not disturb that finding when it considered the matter on appeal and reversed on other grounds. Brewer, supra, 434 F.2d 408